**TRAILWAYS LINES, INC., Appellee,**

v.

**TRAILWAYS, INC. JOINT COUNCIL, Appellant.**

**No. 86–1071.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 12, 1986.

Decided Dec. 29, 1986.

Stephen R. Domesick, Boston, Mass., for appellant.

Leonard Singer, Kansas City, Mo., for appellee.

Before WOLLMAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

Trailways, Inc. Joint Council appeals from the district court's [1] entry of summa-

---

1. The Honorable John K. Regan, United States Senior District Judge for the Eastern District of Missouri.

ry judgment vacating an arbitration award which had been rendered in its favor. 624 F.Supp. 880. For the reasons discussed below, we affirm.

## I. BACKGROUND.

Trailways Lines, Inc. (the "Company"), through a system of separate operating companies, is engaged in the business of interstate transportation of passengers and freight by bus. Before 1983, five locals of the Amalgamated Transit Union ("ATU") had separate collective bargaining agreements with the various operating companies, covering drivers, terminal employees and garage employees. In April of 1983, the Company and Trailways, Inc. Joint Council (the "Union"), which represented the five ATU locals, entered into a national collective bargaining agreement (the "National Agreement"). The National Agreement covered drivers, terminal employees and garage employees at fifteen operating companies of the Company, including Trailways Southeastern Lines and American Bus Lines. Employees of these two operating companies had previously been covered by their respective local agreements.

The National Agreement contained a standard arbitration provision, Section 202, which allowed the parties to submit unresolved grievances to an impartial arbitrator. Subsection (e) of this section contained a final and binding clause. Subsection (g) prohibited the arbitrator from "alter[ing] or amend[ing] the provisions of this contract in any respect."

**2.** Section 103, entitled "MANAGEMENT PRE-ROGATIVE," provided, in relevant part:

> The Union recognizes the rights and prerogatives of the Company to manage, operate and conduct its business and agrees that it will direct its members to abide to the best of their ability and be governed by all reasonable rules, orders and regulations issued by the Company not contrary to or in conflict with this Agreement. The Company shall, insofar as it is practicable, give consideration to the welfare, comfort and convenience of its employees in the making of such rules, orders and regulations, and no change shall be made in any present rule, order or regulation,

Additionally, Section 132(b) of the National Agreement provided: "The Company shall continue to enjoy those past practices which previously were observed in individual Seniority Units." The agreement also contained a management rights provision, which delineated the rights and responsibilities of the Union and the Company in relation to the Company's rules, orders and regulations.[2]

During the first year of the National Agreement, garage employees at Trailways Southeastern Lines and American Bus Lines filed similar but separate grievances under Section 144, claiming that management's "no-beards" policy was an "unreasonable" standard of appearance under the section. Section 144 required employees to "comply with the *reasonable* standards of personal appearance regulations issued by the Company and such reasonable amendments as shall be adopted by the Company, not contrary to or in conflict with the terms of [the] Agreement." (Emphasis added.)

Although the term "reasonable" in Section 144 was not defined, a Company-issued rule book provided: "Every employee is expected to be neat and clean in appearance * * *." Also, on two occasions before execution of the National Agreement, the Company issued written guidelines re-emphasizing its long-standing prohibition of beards on employees who met the public in the course of their jobs, except in cases of medical necessity.[3] The reason the Company instituted, and for at least ten years maintained, the policy was because of its concerns about Company image in light of the intense competition in its industry.[4]

> which would be contrary to or in conflict with this Agreement.

**3.** Although all grievants involved were garage mechanics, they all had at least some contact with the public as a part of their duties.

**4.** As the district court noted:

> The business in which [the Company] is engaged is highly competitive, with substantial competition being furnished not only from national motor carriers such as Greyhound Bus Lines and various regional bus lines but also from airlines (particularly since they were deregulated) and from the rail system. In the view of [the Company's] management

The Company ultimately denied both grievances, after which the Union submitted each grievance to arbitration. The first grievance to reach arbitration was filed by two garage employees of Trailways Southeastern Lines, who had been denied the right to grow beards. On August 8, 1984, Arbitrator David S. Lande ("Lande") denied the employees' grievance. After analyzing the parties' contentions, Lande concluded he could "not find that the [no-beards] rule or its application in the particular circumstances here relevant rises to the status of 'unreasonable'." [5] Rather than filing an action to set aside the award, the Union chose to contest Lande's reasoning in the second arbitration.

On November 7, 1984, three months after the Lande Award was issued, the second "no-beards" grievance was presented to Arbitrator Peter J. Maniscalco ("Maniscalco"). The parties stipulated that the issue to be decided by Maniscalco was whether "the Company violate[d] the Collective Bargaining Agreement when, in March, 1984, it required employees Anders and Christopher, mechanics in the St. Louis garage, to shave off their beards," and "[i]f so, what should be the remedy?" The grievants here were employees of American Bus Lines, who had been ordered to shave off their beards.[6] This grievance was similar to the prior grievance in that it

not only the appearance of the equipment but the appearance of its personnel who have any contact with the public, creates an "image" which may affect its ability to attract and keep the maximum number of customers to use its facilities. For that reason it has adopted (and has for years maintained) its "no beards" policy as part of its growing [sic] standards applicable to all employees who in the course of their employment have some contact with the public.

5. In reaching his conclusion, Lande found:
The arbitrator may be inclined to disagree with the rule, and to believe that its rationale, however good-faith generated and business-related, is inaccurate in the context of present-day society. The arbitrator may believe that on balance, the employer might better serve its own interests by ascertaining that its customers are not as disturbed by the appearance of beards as it may believe and by accommodating the apparent zeal of a segment of the bargaining unit to sport beards. But the arbitrator is not an officer of Trailways, and may not substitute his own judgment, or that of the bargaining unit or the union, where, as here, he can not find that the rule or its application in the particular circumstances here relevant rises to the status of "unreasonable." In the light of the evidence that there is some indeterminate public contact by the garage employees and that the rule has been in effect for almost ten (10) years (if not longer) and was in effect at the time of adoption of Section 144 and may bear a "reasonable" relation to the employer's marketing decisions, the rule and its application here can not be deemed "unreasonable."

6. At the arbitration hearing, the Union argued that beards had regularly been permitted in the St. Louis garage of American Bus Lines, in contrast to the strictly-enforced no-beards rule at Trailways Southeastern Lines. Although the

president of Local 1133, the unit formerly representing employees of American Bus Lines, claimed that mechanics had worn beards "on and off" during the last several years, he could not give the name of any St. Louis mechanic who had done so, nor any other information regarding his assertion. The Union president also testified that he recalled seeing "half a dozen" employees wearing beards, although he could not supply any names. The Company conducted a last-minute survey of its garages across the country and offered to stipulate that 11 of its 500 mechanics wore or were attempting to wear beards. The Union did not stipulate to this finding. Although the Union asserted that the Company did nothing to change the status of the 11 employees, the Company maintained that upon discovering this "non-compliance," it immediately considered taking appropriate enforcement steps.

In contrast to the Union's testimony, the garage manager in St. Louis testified that during his fourteen-year tenure, no mechanic having public contact was allowed to wear a beard. He also testified that from time to time mechanics attempted to grow beards, but that he ordered them to shave within a few days. According to the Company, the two garage employees in the present grievance attempted to grow beards while the St. Louis garage manager was absent on sick leave for several months. One of the employees testified before Maniscalco that he knew at the time that his beard violated the Company's grooming standards. Upon the garage manager's return and after the rule violation was called to his attention, he posted new copies of the Company's standards of appearance regulations and all employees were instructed to comply with the bulletin. The two employees complied with the bulletin, but grieved the Company's enforcement of the no-beards policy, which resulted in the Maniscalco arbitration.

involved the same union, the same company, essentially the same issue, and interpretation of the same collective bargaining agreement.

On February 28, 1985, Maniscalco issued his award and accompanying opinion. Maniscalco ruled in favor of the Union, holding that the Company's absolute prohibition of beards for its garage employees was "unreasonable" under Section 144.

In his opinion, Maniscalco acknowledged the prior Lande Award in a single paragraph, finding that Lande's "conclusion that Section 144 of the [Agreement] may bear a 'reasonable' relation to the employer's marketing decision [and] that, therefore, the rule and its application here cannot be deemed reasonable[,] is in this Arbitrator's opinion a minority view."[7] Rather, Maniscalco stated:

> The real question to be answered in this case is, is an absolute prohibition of beards by garage mechanics in the Company's various facilities throughout the country, without any showing of a detrimental effect on the Company's business, and [sic] unreasonable limitation on the garage mechanics' personal appearance in their private lives?

After further analysis, Maniscalco concluded that the no-beards rule violated Section 144, "because [the rule] was unreasonable in light of the fact that the [Company] presented no proof of the public's real attitude and reaction as well as proof of any demonstrable relationship between those attitudes and the positive public image the Company wished to portray." Finally, Maniscalco found that the parties negotiated the National Agreement, and more specifically Section 144, with a view towards national standards. He concluded that this required "the Company to impose a reasonable standard nationwide in its enforce-

ment of its grooming policy," and therefore, awarded the following remedy:

> The Company should forthwith cease to enforce its grooming policy as it applies to an absolute no-beard requirement by employees covered by the National Agreement employed at garage facilities of the Company. We further find the [C]ompany has the right to require employees so [a]ffected to maintain a neat and well trimmed beard.

Three months later, the Company filed an action under section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, seeking to set aside the Maniscalco Award. The district court granted the Company's motion for summary judgment and vacated the Maniscalco Award. After discussing the parties' various contentions, the district court held:

> Arbitrator Maniscalco gave no consideration whatever to the Lande award other than to state that it represents the "minority view," nor did he even refer to or construe the "final and binding" provision of the contract. It may be speculated that he believes that no decision is final and binding unless it follows what he believes to be the "majority" view even if it draws its essence from the collective bargaining agreement. We add that the awards cited by Arbitrator Maniscalco in his opinion as representing the "majority" view (including his own decision in *Missouri Public Service Co.,* 77 L.A. 973[ ) ]; do not involve "image" *either as affected by competition* or as affected by the type of intense competition such as Trailways faces. In our judgment, Arbitrator Maniscalco was simply dispensing his own brand of industrial justice.
>
> We are also of the opinion that where, as here, an arbitrator (as Lande) has

---

7. At the hearing before Maniscalco, the Lande Award was introduced into evidence. The parties took opposing views of the effect of that award upon the grievance before Maniscalco. As summarized by Maniscalco, the Union contended "that the decision of Arbitrator Lande did not resolve the contractual issues presented in this dispute. The principles of *stare decisis* and *res judicata* do not have the same doctrinal force in arbitration proceedings as they do in judicial proceedings." In opposition, the Company argued that the Lande Award "disposes of the issues in this case because [Lande held] the Company could prohibit mechanics from wearing beards."

definitively construed a provision of the collective bargaining agreement, such construction becomes part of the existing labor agreement, and hence is subject to the provision thereof (Section 202(g)) that an arbitrator "shall have *no power to alter or amend the provisions of (the) contract in any respect.*" Arbitrator Maniscalco wholly failed even to consider or rule [on] this issue.

We also hold that Arbitrator Maniscalco exceeded his authority in providing a "remedy" which is not warranted by the terms of the submission. The sole issue for his determination was whether Trailways was justified in ordering the two grievants to shave their beards and if not, what should be the remedy for the employer's breach of contract. In every award called to our attention, the remedy was limited to what the arbitrator reasonably believed would *restore the grievants* to the position they would have been in but for the employer's breach of contract. Here, however, Arbitrator Maniscalco completely ignored the issue *as formulated by the union* and issued a cease and desist order applicable nation-wide to all garage employees including those expressly covered by the Lande award. [Emphasis supplied by district court.]

This appeal followed.

## II. DISCUSSION.

The issue in this case—whether the district court erred in substituting its interpretation of the collective bargaining agreement for that of Arbitrator Maniscalco—is one frequently addressed by the federal courts.

Here, the Union contends that once the district court determined the parties had agreed to give Maniscalco the power to arbitrate the subject grievance, judicial review of his award should have ended. Moreover, the Union argues that Maniscalco's interpretation of the National Agreement satisfies the requirement that an arbitrator's award draw its essence from the collective bargaining agreement. Similarly, the Union argues that Maniscalco's rem-

edy fulfills this requirement, and therefore, should be accorded the same judicial deference. Further, because no provision in the National Agreement defined "final and binding," the Union maintains that it was within Maniscalco's domain, not the district court's, to evaluate the relevance and effect of the prior Lande award, which interpreted the same provision of the agreement. Because of the Union's contentions, we must take the familiar step of examining the law governing the power of a federal court to review arbitration awards.

We begin by recognizing that where parties to a collective bargaining agreement have provided that an arbitrator's award shall be final and binding, the award is generally non-reviewable by a court. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The Supreme Court recently re-emphasized this principle:

Under well-established standards for the review of labor arbitration awards, a federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be a better one. [*Enterprise Wheel*, 363 U.S. at 596, 80 S.Ct. at 1360]. When the parties include an arbitration clause in their collective-bargaining agreement, they choose to have disputes concerning constructions of the contract resolved by an arbitrator. Unless the arbitral decision does not "dra[w] its essence from the collective bargaining agreement," *id.*, at 597 [80 S.Ct. at 1361], a court is bound to enforce the award and is not entitled to review the merits of the contract dispute. This remains so even when the basis for the arbitrator's decision may be ambiguous. *Id.*, at 598 [80 S.Ct. at 1361].

*W.R. Grace & Co. v. Local Union 759, International Union of United Rubber Workers*, 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983); *accord McGraw Edison, Wagner Division v. Local 1104, International Union of Electrical Workers*, 767 F.2d 485, 487 (8th Cir. 1985).

■ Because it is the arbitrator's decision for which the parties have bargained, *see Enterprise Wheel,* 363 U.S. at 599, 80 S.Ct. at 1362, exceptions to this general rule of non-reviewability are narrow:

> Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; *he does not sit to dispense his own brand of industrial justice.* He may of course look for guidance from many sources, *yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.*

*Id.* at 597, 80 S.Ct. at 1361 (emphasis added). Thus, where an arbitrator has failed to fulfill his contractual obligation, resulting in an award that does not draw its essence from the agreement, courts have refused to enforce the arbitrator's award. *See, e.g., International Union of Operating Engineers, Local 670 v. Kerr-McGee Refining Corp.,* 618 F.2d 657 (10th Cir. 1980); *Detroit Coil Co. v. International Machinists Lodge 82,* 594 F.2d 575 (6th Cir.), *cert. denied,* 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979).

In the present case, it is beyond dispute that the National Agreement gave Maniscalco the "power to make the award he made." *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). Section 202 clearly allowed the parties to submit unresolved grievances arising under the National Agreement to an arbitrator. Moreover, although the district court discussed the possible res judicata effects of the prior Lande Award upon Maniscalco, it did not hold that Maniscalco was without authority to render his award.[8] In fact, the district court stated: "No question of the arbitrator's *jurisdiction* is presented in the instant proceeding. So, too, there is no contention that the second arbitrator is bound by the *rationale of previous decisions or their precedential effect* (as was contended in [*McGraw Edison,* 767 F.2d 489) ]." (Emphasis supplied by district court.)[9]

Instead, the court, invoking the *Enterprise Wheel* exception to non-reviewability,

---

**8.** The district court discussed the fact that the Eighth Circuit has not addressed "the precise issue here involved in this very sensitive area of labor arbitration law." The court noted that in *McGraw Edison, Wagner Div. v. Local 1104, Int'l Union of Elec. Workers,* 767 F.2d 485 (8th Cir. 1985), we held that a subsequent award could not be vacated on the ground that it was inconsistent with a prior award. In *McGraw Edison,* however, both arbitrations involved a different union and a different labor agreement. In contrast, the district court noted that here, the prior arbitral proceeding "necessitated the construction of the *identical* contract provision (Section 144) of the *same national labor contract* between the *same* employer and the *same* union, in deciding the merits of a grievance involving the *same* issue under essentially the *same* facts and circumstances." (Emphasis supplied by district court.) Although the court emphasized these facts, it did not hold that Maniscalco was bound by the prior determination.

**9.** In so concluding, the district court differentiated the res judicata implications in this case from other cases cited by the Union:

> [I]n virtually all of the cited cases one or the other of the parties sought to sidestep its obligations to submit any grievance to arbitration, and the essential issue was either whether a court could enjoin a second arbitrator in advance from deciding the new grievance or whether the court had the authority to compel a party to submit the matter to arbitration as against to hear the grievance.

Thus, the court recognized that those cases involved different questions of the arbitrator's jurisdiction to hear grievances. *See, e.g., Dreis & Krump Mfg. Co. v. Intern. Ass'n of Machinists,* 802 F.2d 247, 251–52 (7th Cir.1986); *IBEW Local 199 v. United Tel. Co.,* 738 F.2d 1564, 1569–72 (11th Cir.1984); *Little Six Corp. v. United Mine Workers, Local Union 8332,* 701 F.2d 26, 27–9 (4th Cir.1983).

In contrast, the facts in this case are akin to the situation postulated in *Automotive Employees Union, Local 618 v. Gelco Corp.,* 581 F.Supp. 1155 (E.D.Mo.1984), where the court stated: "Gelco is free to argue to the arbitrator that the prior decision precludes Mr. Brown's present grievance. If an arbitrator rejects Gelco's contention, then Gelco may sue in this Court to set aside the arbitrator's award, [citation omitted], *if such action is warranted." Id.* at 1158 (emphasis added). Such action may be warranted where a party contends, as the Company did in this case, that the arbitrator's award does not draw its essence from the agreement.

vacated the Maniscalco Award based on its findings that the award did not draw its essence from the agreement. The court specifically stated that Maniscalco "was simply dispensing his own brand of industrial justice," based on the fact that Maniscalco "gave no consideration to the Lande award other than to state it represented the 'minority' view;" that he did not discuss or construe the "final and binding" language of the National Agreement; and that he cited cases representing the "majority" view, including Maniscalco's own decision in *Missouri Public Service Co.*, 77 Lab.Arb. (BNA) 973 (1981), which did not involve "image" as affected by competition.

The district court did not speculate as to why Maniscalco failed to address these relevant issues. On further analysis of Maniscalco's opinion in *Missouri*, however, the reason becomes clear.

It is indisputable that Maniscalco's analysis is in large part a verbatim copy from his award in *Missouri*, although he cited that case only once in his opinion.[10] The facts in *Missouri*, however, differ significantly from the facts in the present grievance. In *Missouri*, the issue formulated for decision was whether the company violated the labor agreement "*and* any valid *past practices* by *arbitrarily and unilaterally* im-

10. The following portions of Maniscalco's opinion in *Missouri Public Serv. Co.*, 77 Lab.Arb. (BNA) 973 (1981), appear in his award in this case. The bracketed material indicates the changes apparently made to accommodate the facts in the present case:

DISCUSSION

Employees generally have a right to decide what their personal appearance will be in private life, away from their place of [business] employment, so long as no harm results to their employer.

We recognize that * * * employee's right to determine his clothing, or hair style, has been to some degree limited by arbitrators by the nature of the employee's employment. Arbitrators recognize both the "image" and the safety and health arguments of the employer [and its] right to regulate employee[s'] personal appearance for those purposes, but not for the purpose of requiring conformity to the employer's preference on such matters.

The prevailing theory is that the Company has a right to require its employees to cut their hair and shave, when long hair and beards can reasonably threaten the Company's relations with its customers or other employees, or a real question of safety is involved, and an employer should be able to expect that his employees will practice personal hygiene and will clothe themselves in a neat manner, at least where the employees meet the public.

However, there must be a showing of a reasonable relationship between the Company's image or health and safety considerations and the need to regulate employee appearance. Therefore, management's right to regulate in this area is not absolute. Its exercise in [any] specific manner may be challenged as arbitrary, capricious or inconsistent with the objective for which the right is being exercised.

The Company and the Union in this case, are asking the Arbitrator to rule on the gener-

al principle of a no[-]beard policy standard of the * * * public image policy [of the Company.] [T]he real question to be answered in this case is, is an absolute prohibition of beards [by garage mechanics in the Company's various facilities throughout the country,] without any showing of a detrimental effect [on] the Company's business, an unreasonable limitation on the [garage mechanics' personal appearance in their private lives]?

* * * * * *

[T]he prevailing theory is that the [C]ompany has [a] right to require its employees to cut their hair and shave[,] when long hair and beards can reasonably threaten the [C]ompany's relations with its customers or other employees, or a real question of safety is involved[, and an employer should be able to expect that his employees will practice personal hygiene and will clothe themselves in a neat manner, at least where the employees meet the public.]

However, there must be a showing of a reasonable relationship between the Company's image [or] health and safety considerations and the need to regulate employee[s'] appearance. [Therefore,] management's right to regulate in this area is not absolute [and] its exercise in any specific manner may be challenged as arbitrary, capricious and inconsistent with the objective for which the right is being exercised. [*Missouri Public Service Company*, 77 L.A. 973, 976 (1981) Arbitrator Peter J. Maniscalco.]

We believe the better arbitral view is to require the employer to present proof of the public's real attitude and reaction as well as proof of a demonstrable relationship between these attitudes and the rules intended to nurture a positive public image.

We find the Company has not shown any reasonable relationship between its [absolute no-beard policy] and the real attitudes of the public it serves.

plementing a *new* 'Public Image Policy'?" *Id.* at 974 (emphasis added). There, the undisputed evidence showed that numerous workers wore beards, and that this had been the past practice for at least eight or nine years before the new policy was announced. *See id.* The labor agreement, however, did not contain any provisions concerning standards of personal appearance, nor were there any written policies regarding the wearing of beards. Thus, because of this silence and because the "law of the shop" was unilaterally altered, Maniscalco required the company to justify its departure from the long-standing past practice and the effect of such departure on the employees' private lives.

■ In this grievance, although the stipulated issue did not expressly require Maniscalco to consider past practices, the issue did require Maniscalco to determine whether the Company's no-beards policy violated the *National Agreement.* In contrast to the *Missouri* agreement's silence in areas relevant to this issue, the National Agreement specifically spoke on standards of appearance. Furthermore, the National Agreement contained two other provisions that arguably had an impact on the issue: Section 103, which covered management prerogatives with respect to Company rules; and Section 132, which provided that the Company "shall" continue to enjoy all "past practices."

Although Maniscalco laid out the above three provisions in his "Introductory Remarks," he did not discuss anywhere in his opinion the effect of the latter two provisions on the Company's long-standing no-beards policy, despite their obvious relevance to the issue.[11] Specifically, by ignoring the Company's past practice of prohibiting beards on employees who meet the public, Maniscalco ignored an extremely relevant source of common law—the law of the shop.[12] In fact, courts have vacated awards solely because of the arbitrator's failure to consider this evidentiary source. *See, e.g., Timken Co. v. Local Union No. 1123, United Steelworkers,* 482 F.2d 1012 (6th Cir.1973); *see also Norfolk Shipbuilding and Drydock Corp. v. Local No. 684 of the International Brotherhood of Boilermakers,* 671 F.2d 797 (4th Cir.1982) (remanded to district court to consider evidence of past practices proffered by union). Maniscalco, however, not only ignored the law of the shop; he failed to discuss Section 132, which seemingly codified this law in the bargained-for agreement of the parties. Unquestionably, the agreement is a more relevant source of a company's past practice and custom than is the common law, *see generally* F. Elkouri & E. Elkouri, How Arbitration Works 437–56 (BNA 4th ed. 1985), although Maniscalco discussed neither.

Moreover, Maniscalco completely altered the stipulated issue for decision by copying from his opinion in *Missouri.* Instead of focusing on whether the Company's no-beards policy violated the National Agreement, he felt the "real question" to be answered was whether the policy was an "unreasonable limitation on the garage mechanics' personal appearance in their private lives," in light of the fact that the Company did not show any "detrimental

---

**11.** According to the Company, substantial portions of the evidentiary hearing and the post-hearing briefs were devoted to this issue. As already discussed, the Union attempted to argue before Maniscalco that beards were previously worn by American Bus Lines mechanics. However, the evidence overwhelmingly supported the Company's contention that its no-beards policy was in effect and enforced for many years prior to execution of the National Agreement, as the district court acknowledged.

**12.** As the Supreme Court has stated, an "arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960); *accord Aircraft Mechanics Fraternal Ass'n v. Ozark Air Lines, Inc.,* 597 F.2d 1155, 1157 n. 2 (8th Cir.1979); *Sterling Colorado Beef Co. v. United Food and Commercial Workers, Local Union No. 7,* 767 F.2d 718, 721 (10th Cir.1985); *Norfolk Shipbuilding and Drydock Corp. v. Local No. 684 of the Int'l Bhd. of Boilermakers,* 671 F.2d 797, 799–800 (4th Cir.1982).

effect on the Company's business." This was not the issue to which the parties stipulated, nor did the parties subsequently agree to submit it to Maniscalco.[13] Although this issue may have been appropriate for decision in *Missouri* in light of the facts in that case, it simply was not placed before Maniscalco in the present arbitration.

Further, by altering the issue for decision and failing to consider relevant provisions of the National Agreement, it is questionable whether the burden of proof placed on the Company by Maniscalco draws its essence from the agreement.[14] In copying from his opinion in *Missouri*, Maniscalco stated that "the better arbitral view is to require the employer to present proof of the public's real attitude and reaction as well as proof of a demonstrable relationship between these attitudes and the rules intended to nurture a positive public image." In *Missouri*, however, the evidence showed that the employer *unilaterally* sought to alter the long-established practice of allowing employees to wear beards. As already discussed, the agreement's silence on issues relevant to Maniscalco's determination thus required him to place some type of burden of proof on the company to justify its actions. In contrast, the agreement here specifically provided for standards of appearance, continuation of past practices and management prerogatives—provisions that clearly were relevant to the issue before Maniscalco, but provisions that he did not address.

Finally, as the district court noted, the cases cited by Maniscalco, including *Missouri*, did not involve the same "image" concerns as the Company had. In *Missouri*, for example, the employer was a public utility company, which probably faced little, if any, competition; the company's sole reason for unilaterally instituting its new no-beards policy was its "[concern] about its image with the general public." *Missouri*, 77 Lab.Arb. at 975.

In contrast, here the Company's decision to implement the no-beards policy was not new, arbitrary or unilateral; the Company decided over ten years ago to implement and maintain the policy based on economic reasons. Moreover, it cannot be disputed that the busing industry is highly competitive. Therefore, the Company had ample reason to be concerned about its image, as personified in its employees who met the public. Rather than focusing on these facts, however, Maniscalco chose to analyze the "image" issue in the same manner as he did in *Missouri*.

By copying a substantial portion of his analysis from a completely different case rather than focusing on the facts of the grievance before him, Maniscalco ignored relevant provisions of the National Agreement and the law of the shop, altered the issue for decision, and ruled in favor of the Union based on "the prevailing theory," "the better arbitral view," and the "majority" view rather than on the intent of the parties as evidenced in the National Agreement. For these reasons, we agree with the district court that Maniscalco was dispensing his own brand of industrial justice. In fact, by copying analysis from an earlier opinion involving totally different facts and a dissimilar collective bargaining agreement, Maniscalco's words *literally* manifested an infidelity to his obligation as an interpreter of the specific collective bargaining agreement before him. Thus, the

---

**13.** Although the grievance itself was a matter properly submitted to arbitration, we have sincere doubts whether it was proper for Maniscalco to decide the issue as reformulated by him. *Cf., e.g., AT & T Technologies, Inc. v. Communications Workers of America,* — U.S. —, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (party cannot be required to submit to arbitration any dispute which he has not agreed so to submit).

**14.** We are cognizant of the Union's argument that a court should not review an arbitrator's placing of the burden of proof. *See Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). However, this court is not reviewing Maniscalco's burden of proof. Rather, we are merely noting that Maniscalco failed to account for relevant provisions of the National Agreement in analyzing the grievance before him, and instead copied the burden of proof statements from his analysis in *Missouri*.

resulting award simply did not draw its essence from the agreement.

Additionally, although not the basis of our decision, we also express grave concerns over Maniscalco's treatment of the Lande Award. As the district court noted, Maniscalco did not account for the "final and binding" clause of the National Agreement or how it applied to the Lande Award.[15] Rather, Maniscalco stated only that the Lande Award represented the "minority view," and thus refused to accord it any deference. Although an arbitrator generally has the power to determine whether a prior award is to be given preclusive effect, *see, e.g., Connecticut Light & Power Co. v. Local 420, International Brotherhood of Electrical Workers*, 718 F.2d 14, 20 (2d Cir.1983), courts have also recognized that the doctrine of res judicata may apply to arbitrations with strict factual identities. *E.g., United Electrical Radio and Machine Workers v. Honeywell, Inc.*, 522 F.2d 1221, 1228 (7th Cir.1975); *accord International Chemical Workers Union Local No. 189 v. Purex Corp.*, 427 F.Supp. 338, 339 (D.Neb.), *aff'd per curiam*, 566 F.2d 48 (8th Cir.1977). Maniscalco, however, did not discuss the similar nature of the two grievances and why, in light of this fact, the Lande Award was not to be given preclusive effect.

Moreover, Maniscalco did not consider whether Lande's interpretation of Section 144 effectively became a part of the National Agreement, and therefore, was not subject to alteration or amendment under Section 202(g). In fact, Maniscalco's actions were in direct contradiction to the established arbitral principle that "[a]n award interpreting a collective [bargaining] agreement usually becomes a binding part of the agreement and will be applied by arbitrators thereafter." Elkouri, *supra*, at 425 (citations omitted). As Elkouri notes, "where a 'prior decision involves the interpretation of the identical contract provision, between the same company and union, every principle of common sense, policy, and labor relations demands that it stand until the parties annul it by a newly worded contract provision.'" *Id.* at 426 (citation omitted). Of course, we recognize that there may be situations where an arbitrator will refuse to defer to a prior award involving the same issue.[16] Maniscalco, however, gave no reason for refusing to apply the Lande Award other than that it represented the "minority view."[17] This is especially puzzling in light of the fact that the Lande arbitration involved the same company, the same union, essentially the same issue, and interpretation of the same contract. If an arbitrator does not accord

15. Although the Union argues that only the stipulation submitted to Maniscalco purports to seek resolution of the "no-beards" issue with "finality," this contention is without merit. It is indisputable that the National Agreement contained a "final and binding" provision, and that this clause would apply to any grievance submitted to arbitration under the agreement.

16. Elkouri cites three instances where such a refusal may be justified: "(1) The previous decision was clearly an instance of bad judgment; (2) the decision was made without the benefit of some important and relevant facts or considerations; or (3) new conditions have arisen questioning the reasonableness of the continued application of the decision." F. Elkouri & E. Elkouri, How Arbitration Works 428 (BNA 4th ed. 1985) (quoting *Inland Steel Co.*, 1 ALAA ¶ 67,248 (1944)); *accord Connecticut Light & Power Co. v. Local 420, Int'l Bhd. of Elec. Workers*, 718 F.2d 14, 20 (2d Cir.1983). Maniscalco, however, did not hold that Lande's decision was "an instance of bad judgment," but rather, that it

represented a "minority view." *Compare Connecticut Light*, 718 F.2d at 17 (second arbitrator specifically found that the first arbitrator's award was "analytically unsound," and therefore refused to defer to it); *Westinghouse Elevators v. S.I.U. de Puerto Rico*, 583 F.2d 1184, 1186 (1st Cir.1978) (court recognized that an arbitrator's award may be vacated where his conduct is "improper," but noted that no such challenge was made to the second arbitrator's conduct in the instant case). Moreover, the other two considerations were inapplicable to the grievance before Maniscalco.

17. We are aware that a "mere ambiguity" in an arbitrator's opinion is insufficient to justify refusing to enforce an award. *Enterprise Wheel*, 363 U.S. at 598, 80 S.Ct. at 1361. Here, however, there was no ambiguity; there was, in fact, *nothing* in Maniscalco's opinion explaining his refusal to depart from Lande's reasoning or result, other than that it represented the "minority view."

any precedential effect to a prior award in a case like this, or at least explain the reasons for refusing to do so, it is questionable when, if ever, a "final and binding" determination will evolve from the arbitration process.

## III. CONCLUSION.

Because Maniscalco failed to fulfill his contractual obligation, but instead based his decision on personal notions of what was proper—as evidenced by his copied analysis from a totally dissimilar case and his disregard for relevant provisions of the National Agreement—the Maniscalco Award did not draw its essence from the agreement. Accordingly, we affirm the order of the district court vacating the Maniscalco Award.[18]

---

**18.** Because we have found that Maniscalco's award does not draw its essence from the agreement, we do not address the district court's findings that the nationwide remedy ordered by Maniscalco exceeded the bounds of his authority.