## MOBIL OIL CORPORATION

v.

## OIL, CHEMICAL AND ATOMIC WORK-ERS INTERNATIONAL UNION AND LOCAL UNION NO. 4–522 O.C.A.W.I.U.

Civ. A. No. 91–3368.

United States District Court,
E.D. Louisiana.

Dec. 4, 1991.

David E. Walker, Alvin J. Bordelon, New Orleans, La., for plaintiff.

Louis L. Robein, Jr., Metairie, La., for defendant.

McNAMARA, District Judge.

Before the court are Defendant's and Plaintiff's Cross–Motions for Summary Judgment. The matter is before the court on briefs, without oral argument.

Plaintiff seeks judicial review of an arbitration award. The challenged arbitration proceeding was conducted by Arbitrator Leeper on February 8, 1991. That proceeding concerned an Employee Attendance Improvement Program (the Program) at Plaintiff's refinery that affected Defendant's members.

The Program is styled a "no fault" system for discouraging absences from work. With limited exceptions, all absences are counted in determining whether a particular employee is subject to the Program's multi-tiered system designed to "improve attendance." Absences due to illness or family emergencies, for example, are not excepted under the Program, and that fact is among the Defendant's (Union's) principal complaints.

The Arbitrator ruled that the Program was "unreasonable," Arbitrator's Opinion and Award, at 21, effectively terminating the program. Plaintiff (Mobil) argues that the entire Program was not at issue, but only the changes in the program instituted on August 1, 1990, following Mobil's purchase of the refinery from Tenneco.[1] Alternatively, Mobil argues that the Arbitrator exceeded the bounds of the authority granted to him by the Collective Bargaining Agreement and that either of these transgressions are sufficient to warrant a reversal of the Arbitrator's decision, despite the great deference generally afforded such decisions.

This controversy—and its resolution—turn on the question of what exactly was submitted to the Arbitrator.

---

1. A Program similar to Mobil's, but with different numbers of absences triggering the various action levels, had been in place at the refinery during Tenneco's ownership.

## THE LAW

The Supreme Court has articulated the two controlling principles. First, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987). On the other hand, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986).

More generally, "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1988).

The Fifth Circuit Court of Appeals has put it this way: "Judicial deference to arbitration ... does not grant carte blanche approval to any decision an arbitrator might make.... The arbitrator's authority is circumscribed by the arbitration agreement, and he can bind the parties only on issues that they have agreed to submit to him. Whether an arbitrator has exceeded these bounds is an issue for judicial resolution." *Piggly Wiggly Operators Warehouse, Inc. v. Truck Drivers Union, Local No. 1*, 611 F.2d 580, 583 (5th Cir. 1980).

In that same case, the Fifth Circuit elaborated on the submission process:

Before arbitration can actually proceed, it is necessary for the parties to supplement the agreement to arbitrate by defining the issue to be submitted to the arbitrator and by explicitly giving him authority to act.... This statement of issues and designation of the arbiter is frequently incorporated into a separate document, called a submission agreement.... If the parties enter into a submission agreement, this later contract is the substitute for legal pleadings; it joins the issues between the parties and empowers the arbitrator to decide.... The parties may act formally and enter into a written submission agreement or they may merely ask the arbiter to decide the written grievance as it has been posed in their conciliation efforts. When they do so, they have in effect empowered him to decide the issues stated in the grievance. The grievance itself becomes the submission agreement and defines the limits of the arbitrator's authority.

*Id.* at 583–4.

In *Waverly Mineral Products Co. v. United Steelworkers*, 633 F.2d 682 (5th Cir.1980), the Fifth Circuit quotes the United States Supreme Court in the "Steelworkers Trilogy" to the effect that "Doubts [about the extent of matters subject to arbitration] should be resolved in favor of coverage," *Id.* at 684 (quoting *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409), and adds: "The employer also argues that even if, as we conclude, this dispute was subject to arbitration as a matter of construction of the collective bargaining agreement, still the arbitrator exceeded the scope of the issue as it was submitted to him.... *We think it was for the arbitrator to decide just what the issue was that was submitted to it and argued by the parties.*" *Id.* 633 F.2d at 685 (emphasis added).

Among the other circuits, the Ninth Circuit has been the most explicit in "hold[ing] that an arbitrator's interpretation of the scope of the issue submitted to him is entitled to the same deference accorded his interpretation of the collective bargaining agreement." *Pack Concrete, Inc. v. Cunningham*, 866 F.2d 283, 285 (9th Cir.1989) (citations omitted).

As the Tenth Circuit has put it:

The parties may limit the discretion of the arbitrator, such as through submitting a precise statement of the issues to the arbitrator or through providing express limitations in the collective bar-

gaining agreement.... When the parties fail to limit the scope of the submission, however, we will affirm the arbitrator's award if it draws its essence from the collective bargaining agreement and is not contrary to the express language of that agreement.

*United Food and Commercial Workers, Local No. 7R v. Safeway Stores, Inc.*, 889 F.2d 940, 947 (10th Cir.1989) (citations omitted).

The Sixth Circuit has said that "where the question of the submission to the arbitrator is vague, the award of the arbitrator will not be set aside in a subsequent court proceeding, unless it can be shown that the essence of the resulting award was not drawn from the collective bargaining agreement." *Kroger Co. v. Int'l Bhd. of Teamsters,* 380 F.2d 728, 730–31 (6th Cir. 1967).

The Second Circuit has asserted that "it is not the function of a reviewing court, in the guise of interpreting the scope of the submission agreement, to substitute its judgment on the law for what the arbitrators thought with good reason to be relevant." *Federal Commerce & Nav. Co. v. Kanematsu–Gosho, Ltd.,* 457 F.2d 387, 389 (2d Cir.1972). "It has been the rule to resolve any doubt as to the submission agreement in favor of coverage." *Id.* at 390.

The Eleventh Circuit has added: "In light of the federal policy favoring arbitration at work here, our task is to resolve all doubt in favor of the arbitrator's authority to award a particular remedy." *Willoughby Roofing & Supply v. Kajima Int'l, Inc.,* 776 F.2d 269, 270 (11th Cir.1985).

## THE FACTS

■ Arbitrator Leeper's first question at the subject arbitration hearing on February 8, 1991 was: "Is there an agreed statement of the issues?" Hearing transcript, p. 1. Mr. Bergeron, the Union representative, responded, "I don't think so." *Id.* Mr. Walker, Mobil's representative, then directed the attention of the participants to "preliminary grievances ... joint exhibits and stuff like that." *Id.*

Two pages later, the Arbitrator says: "Well, let's see. Still haven't got an issue. You want to make your opening statements and then see if you can work out one?" *Id.* at 3. Bergeron, for OCAW, says: "Well, I think the issue is described in the grievance. The grievance charges the Company with a violation under the Collective Bargaining Agreement by the unilateral implementation of Joint Exhibit #5, which is the Attendance Improvement Program, which we believe is unreasonable, unrealistic and therefore it should be set aside on that basis. That is the issue." *Id.* at 3–4. Mobil's response, by Mr. Walker, was: "I—okay—*I would have no problem with that, that statement of the issue. I think you can see the grievance is stated in rather general terms—.*" *Id.* at 4 (emphasis added).

At this point, it is necessary to consider two prior arbitration hearings that have some bearing on this case—one held by Arbitrator Maxwell in 1987 and one by Arbitrator Mann held January 25, 1991. Mr. Walker (Mobil) brought up the Mann hearing early on in the proceedings before Arbitrator Leeper: "We had an arbitration two weeks ago. It involved the attendance control program. It did not involve Joint Exhibit #5 [the revised program]. As a matter of fact, the Arbitrator specifically said, 'I'm not going to consider the revisions that occurred in August.' So he was looking more in the past." Walker goes on to elaborate on the January 25, 1991 hearing before Mann.

Mobil has argued that because "the question of considering pre-purchase employment records was pending before Arbitrator Mann and as a result was not being submitted to Leeper," therefore, *only* post-purchase matters, i.e. the revisions to the Program, were before Arbitrator Leeper. Memorandum in Support of Cross–Motion for Summary Judgment, at 12. The transcript of the Mann hearing, however, discloses that "The issue in [that] case [was]: 'Was the disciplinary action taken against the Grievant on or about June 19, 1990 for just cause? If not, what shall the remedy be?'" Mann report, at 1.

The matter turned on whether it was reasonable/permissible for Mobil to count absences by the employee that occurred *before* Mobil's purchase of the facility from Tenneco. Nothing in that transcript suggests that the no-fault Program itself was "at issue" in the Mann hearing. Mann denied the grievance, holding that "since it is my opinion that the Company has the right to use the information in the personnel records prior to its purchase from Tenneco, then the Company could use such information about the Grievant's attendance records as was in those files." Report of Mann hearing, p. 7.

Mobil also suggests that because the no-fault feature of the Program was "vigorously attacked" by the union at the other arbitration hearing, before Arbitrator Maxwell in 1987, Memorandum at 7, that the matter was somehow res judicata for Arbitrator Leeper's hearing. Again, however, Maxwell's report indicates that "The Issue" was "Was Mr. Langly discharged for just cause and, if not, what is the remedy?" Maxwell report, at 2. No challenge to the Program itself is indicated in the Maxwell report. Rather, it focuses on the particulars of the employee, who averaged 19.8% absences over a ten-year period with absences in one year as high as 42.8%. Maxwell does remark in his Conclusion that "even though an employee may be legitimately ill or ligitimately [sic] absent for personal reasons, an employer is not required to accept or tolerate an inordinate amount of absenteeism," *Id.* at 8, but that's as close as he comes to any comment on the no-fault concept, much less on "the Program." Such a statement, in the context of a hearing concerning a particular employee who has missed more than 40% of a year's work, does not, of itself, constitute a blanket adjudication on the merits of the Program.

Returning to the Leeper hearing transcript, the Union's opening statement challenges the Program itself, and the "no-fault" concept on which it rests, in no uncertain terms:

We further contend that this policy, which disregards contractually negotiated benefits as an excused leave of absence ... is arbitrary, capricious and contrary to the provisions of the Collective Bargaining Agreement, and would in effect eliminate the just cause provisons for discipline and discharge that cannot and must not be allowed....

The Union would respectfully request the Arbitrator to sustain the grievance and to order the Company to cease and desist from applying this unreasonable and unrealistic program and further that all action taken under this program be rescinded and removed from all the employees' files and that all the employees affected by this program be paid for all monies lost and that they be made whole in each and every respect.

Transcript at 10.

The arbitrator then invited Mr. Walker (Mobil) to comment: "Do you care to comment on his—" to which Walker interrupted: "No, ... I'll reserve my opening statement until [Bergeron] ... has concluded his case." *Id.* at 11.

Some rather lengthy quotes are necessary to convey a sense of the hearing—of the Union's articulation of what it saw as the issue, of the Company's participation in that discussion, and of the Arbitrator's coming to his appreciation of "the issue."

The Union first called as its primary witness Laura Cowser, Labor Relations Supervisor for Mobil. After extensive testimony about the treatment of leaves of absence, the following exchange ensued:

WALKER: Mr. Arbitrator, we're getting a little far afield here. I didn't think that the leave of absence provision was the subject of this grievance.

BERGERON: I'd like to refer you to—

ARBITRATOR: Wait a minute, wait a minute.

BERGERON: It's not a part of the Agreement. Leave of absence is part of the program. The grievance is challenging the reasonableness of this program and in order to determine how the program is applied, since it makes reference to the leave of absence as an excusable absence.

\*     \*     \*     \*     \*     \*

WALKER:—The point is that is not part of this grievance. This witness has just said that an approved leave of absence is excluded under the attendance improvement program. She defined in this one example an approved leave of absence not being a one-day—okay—you have to take that at face value and then go on and say, 'With that definition, this program is unreasonable.' I don't think you ought to try to prove to her, 'oh, yes, you can get a leave of absence for one-day family emergency', because that's not at issue here. If she—if she thinks it's not, fine. Let's take that at face value and then weigh the attendance improvement program on that basis.

BERGERON: I appreciate your help. Dave. However, *in order to show the unreasonableness of the program,* we have to find out under this program what constitutes a leave of absence and see whether or not that leave of absence is provided for under the contract or not provided for under the contract. And that will determine the reasonableness of the Company granting a leave of absence under the contract. It wasn't us that issued the program; the Company did that.

WALKER: No. I think if you show a violation of the leave of absence article that has nothing to do with your attack on this program. I think—*I think the grievance has got to be limited to attacking this program,* not attacking our interpretation of what leaves of absence are, because we're not prepared to respond to that.

*Id.* at 15–16 (emphasis added). To this court, that exchange, along with the exchange at the beginning of the hearing (*supra*) indicates that the Arbitrator was hardly unreasonable in designating "the issue" as the Program itself.

Later, the following exchange took place. It shows the Union arguing that the *grievance* is about the program from its inception. The Company counters that, except for the revisions, it's the way it's always been. True, the Union says, but we're here to talk about the reasonableness of the Program itself, something we've never tackled before, and if it's unreasonable now, it's unreasonable period. The Arbitrator then acknowledges his understanding of the dispute. It went like this (emphasis has been added):

ARBITRATOR: Let me ask one thing: up until this employee—I mean attendance assistance, attendance improvement program was implemented, did it matter in the past whether, when employees were disciplined that that sort of thing [re: leaves of absence] came up or is this a new element that's brought about by the no-fault attendance program?

BERGERON: It came up about when Tenneco initially instituted its no-fault program, which was not agreed to by the Union and challenged by the Union.

WALKER: Years ago.

BERGERON: Years ago and it continued.

WALKER: That's not a new feature in this program, if that's your question.

ARBITRATOR: Yes, yes.

BERGERON: Wait—that issue had not been resolved because we did not arbitrate the attendance program per se under Tenneco. We arbitrated their discipline which was meeded [sic] out under the program.

ARBITRATOR: One at a time.

BERGERON: One at a time. And we challenged in those cases when a person called in for emergency, it was marked 'personal' and they were excused by the Company. The argument of Tenneco was 'when a guy calls in personal and asked for a personal day off, how are we going to tell him no?' And so they approved it and the individual goes on and believes he's got an excused absence. And then when they came up with their no-fault program and started counting those, we challenged—

ARBITRATOR: Tenneco did that?

BERGERON: Tenneco did. We challenged those on an individual basis.

*Now we have Mobil that comes in and for the first time implements their program and we decided in this case because the program is so unreasonable that we're going to challenge the reasonableness of the program from the very beginning.*

WALKER: Let me just make one point of information and correction. I think the evidence will show that when Mobil acquired the Refinery, it adopted the existing Tenneco program. Jimmy is trying to insinuate that Mobil didn't have a program before August of 1990. The existing Tenneco program on this particular point on the exceptions was the same as it is now.

ARBITRATOR: Well, that does make a difference, if there's been a history of that both as to both [sic] the Tenneco and Mobil, which predated the implementation of this AIP and it's been resolved—

BERGERON: *It has not been resolved. That issue has never been resolved under Mobil or under Tenneco....* When Mobil purchased the Refinery, we got a provision under Article 20 that the Arbitrator may want to look at, which is a make whole clause, which the Company has alleged to us in many cases 'this is a new day'. But now, when it comes to attendance, it's not a new day. And that issue is being, going to be resolved by Arbitrator Mann. Okay? Now we're talking about Mobil's interpretation. We didn't agree with Tenneco's nor do we agree with Mobil's. There's no precedent or practice established at any place where the Union agreed with either program.

ARBITRATOR: All right. I think I understand. I'm gradually absorbing the essence of the difference of opinion, the dispute, and I think we're ready to proceed.

*Id.* at 26–28. The bulk of Bergeron's questioning continued in the vein of what "no-fault" means and how it works—a straightforward challenge to the Program itself.

In his own opening statement, Walker (for Mobil) does say: "The revisions are what's before you today, in August of 1990. Those revisions were not dropped out of the sky by Mobil." *Id.* at 51. But that comes after extensive discussion of the merits and workings of the Program, during the Union's presentation of the case, in which he participated without significant objection.

A considerable amount of the testimony presented in the Company's portion of the hearing is dedicated to an explanation of the need for the program, in essence defending the Program itself.

Given the Fifth Circuit's admonition (*supra*) that, absent a submission agreement, "[t]he grievance itself becomes the submission agreement and defines the limits of the arbiter's authority," *Piggly Wiggly*, 611 F.2d at 584, it is appropriate to examine "the grievance."

The "Complaint or Grievance Report" that initiated the action makes a quite general charge: "The Company unilaterally instituted an unreasonable hourly attendance improvement program" in violation of Articles 1 and 4 of the Collective Bargaining Agreement and any other provisions of the Agreement that may be found to apply.

In his "Opinion and Award," Arbitrator Leeper dealt with the "Issue" this way:

The issue proposed by the Union is as follows: Is the Company's no-fault Attendance Improvement Program unilaterally instituted August 1, 1990, reasonable, and was it established in accordance with the Collective Bargaining Agreement: If not, what shall the remedy be?

The Company proposed the issue as follows: Whether or not the revised Attendance Improvement Program effective August 1, 1990, is unreasonable and thereby in violation of Article 4 of the Labor Agreement? The Union has the burden of proving that this rule is unreasonable. *Regal Plastic Company*, 86 LA 788, Wire Rope Corp., 95 LA 126. The arbitrator considers the statement of the issue proposed by both parties to be accurate, and the union has the burden

of proving that the Company's rule is not reasonable.

Opinion and Award, at 2. It might be argued that to hold "the statement of the issue proposed by both parties to be accurate" requires some kind of schizophrenia. But it might also be argued that finding them both to be accurate only requires an appreciation that the "no-fault" concept is what is being challenged and that if that falls (whether with the specifics as they existed after or before the revisions), then the Program falls. Without a formal submission agreement, the case law (*supra*) strongly supports the arbitrator's authority to make that call. He put it this way:

"[T]he weight of arbitral authority supports the decision of the Company herein to adopt an Attendance Improvement Program," *Id.* at 14, *but*

absences due to illness and other *contractually approved* kinds of leave may not be counted as occurrences which lead to discipline and ultimately to discharge, *especially when sick leave is provided in the Agreement.* This supports the overwhelming evidence contained in the cases discussed above, *including those cited by the Company*, that the 'law of the shop' on Attendance Control Programs that has developed in the past several years has established a standard which, when the Chalmette Refinery's policy is measured against it, compels the conclusion that the Company adopted an unreasonable policy, which violated the clear language of the Labor Agreement, when it failed to exclude from coverage of the Program absences due to illness, Article 17, (short-term disability benefits) and absences due to family emergencies which Article 13 of the contract says, 'Such absences will be granted.' Therefore, the Arbitrator must conclude that the Union has established by strong, clear and convincing evidence its contention that the Attendance Improvement Program is unreasonable as to the counting of absences for sick leave and family emergencies.

*Id.* at 21 (emphasis added).

■ The Arbitrator's mention of the "law of the shop" brings up the Company's final contention that the Arbitrator exceeded the bounds of the Collective Bargaining Agreement. Mobil has argued that "[t]he parties bargained not for a standard derived from 'the law of the shop' as it may be found in published awards but for a standard of 'reasonableness' based upon the needs of workers, the requirements of the employer and multiple other considerations *in the Chalmette refinery.*" Memorandum in Support of Cross–Motion for Summary Judgment, at 20.

In support of this notion, Mobil cites *In Re Marine Pollution Service, Inc.*, 857 F.2d 91 (2d Cir.1988) and *Trailways Lines, Inc. v. Trailways, Inc. Joint Council*, 807 F.2d 1416 (8th Cir.1986). Both are inapposite. *In Re Marine* involved truck drivers for two commonly-owned concrete manufacturers/distributors in bankruptcy. One company suspended operations and the other continued to operate in Chapter 11. Drivers for the closed company claimed they should have been "slotted into" the roster of the still-operating company under the "merger" provisions of their contract.

In fashioning a remedy, the arbitrator drew upon what he regarded as his 'carte blanche' in determining the award in this case'.... Consequently, based on his 'guiding principle of equity,' ... he eschewed the remedies provided in Section 9 [of the Contract]. The Transit Mix drivers [of the closed company] were not 'slotted' into the [still-operating company's] roster, but instead, a new roster, drawing alternately from each employer's list, was established.

*In Re Marine*, 857 F.2d at 93.

The court noted that "[a]n arbitrator's decision is entitled to substantial deference, and the arbitrator need only explicate his reasoning under the contract 'in terms that offer even a barely colorable justification for the outcome reached' in order to withstand judicial scrutiny." *Id.* at 94 (quoting *Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691, 704 (2d Cir.1978)). In this case, however, "the arbitrator never explicated his reasons under the contract." *Id.* 857 F.2d at 96. Pointed-

ly, the court noted that "the arbitrator never mentioned the bargaining history of the parties [nor] the custom in the industry" in his award, *Id.*, suggesting that that history and custom would have been appropriate for the arbitrator's reliance.

In *Trailways*, the company's policy against beards was at issue. In affirming the district court's grant of the Company's motion for summary judgment vacating the arbitrator's award, the Eighth Circuit was impressed that the arbitrator relied primarily on his own prior decision in an earlier arbitration of a similar subject. In the earlier case, however, the policy itself had been challenged in the grievance, as opposed to the circumstance in *Trailways* in which the grievance was limited to the complaint of two employees. The court found that the arbitrator had "based his decision on personal notions of what was proper." *Trailways*, 807 F.2d at 1426.

In the instant case, Arbitrator Leeper can hardly be accused of a similar reliance on "personal notions." He lists four pages of cases from which he drew, including several "cited by the company." Opinion and Award, at 17–20.

> The Supreme Court has said, in fact, that The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished.... The ablest judge cannot be expected to bring the

same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed.

*United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960).

### CONCLUSION

When there is no formal submission agreement, the arbitrator is empowered to decide the issue under review, and that decision is due the same deference as his interpretation of the collective bargaining agreement (CBA). The only exception to that is if he can be said to be operating outside the CBA. Mobil's argument in the present case that the arbitrator's reliance on the "law of the shop" takes the matter outside the CBA is insupportable. Therefore, the arbitrator's award should be affirmed as a matter of law. Accordingly,

IT IS ORDERED that the Defendant's Motion for Summary Judgment is hereby GRANTED. The Plaintiff's Cross–Motion for Summary Judgment is hereby DENIED.