JOHN MORRELL & COMPANY, Appellee,

v.

LOCAL UNION 304A OF the UNITED FOOD AND COMMERCIAL WORKERS, AFL–CIO; United Food and Commercial Workers International Union, AFL–CIO and CLC; Dennis Foster, Individually and in his capacity as president of defendant Local 304A; James R. Lyons, Individually and in his capacity as Business Representative and Corresponding Secretary of defendant Local 304A; John Doe and Other Persons Unknown, Appellants.

JOHN MORRELL & COMPANY, a corporation, Appellee,

v.

LOCAL UNION 304A OF the UNITED FOOD AND COMMERCIAL WORKERS, AFL–CIO AND CLC; United Food and Commercial Workers International Union, AFL–CIO and CLC, Appellants.

Nos. 89–5109, 89–5152.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1989.

Decided Sept. 7, 1990.

Laurence Gold, Washington, D.C., for appellants.

George A. Joseph, Chicago, Ill., for appellee.

Before McMILLIAN, JOHN R. GIBSON and BOWMAN, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

The Unions representing workers at John Morrell & Company's plant in Sioux Falls, South Dakota appeal a $24.6 million jury award entered against them in favor of Morrell. The jury found that the Unions had breached the no-strike clause of the parties' collective bargaining agreement by engaging in sympathy strikes. The district court,[1] 708 F.Supp. 273, entered judgment for Morrell and also vacated an arbitration award, issued between the liability and damages phases of the bifurcated jury trial, that had held that the no-strike clause did not bar sympathy strikes. The Unions now appeal and argue that the district court erred by: (1) submitting the issue of whether the collective bargaining agreement prohibited sympathy strikes to the jury; (2) making various rulings during the damages phase of the trial; and (3) vacating the arbitration award. We affirm the judgment of the district court.

Morrell operates a meat packing business and has plants at various locations, including Arkansas City, Kansas; Sioux City, Iowa; and Sioux Falls, South Dakota. Both Local 304A of the United Food and Commercial Workers, and the United Food and Commercial Workers International Union (collectively the "Unions") represent the Sioux Falls employees. On July 1, 1986, the Arkansas City workers went on a lawful strike designed to secure a new collective bargaining agreement with Morrell. To increase the economic pressure on Morrell, Arkansas City employees travelled to the Sioux Falls plant and established picket lines there on August 4 and 15, 1986. On both occasions, the Sioux Falls workers honored these picket lines and refused to report to work.

Morrell then sought to enjoin the Sioux Falls employees from striking under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1988). Morrell alleged that the Sioux Falls employees breached the no-strike provision of their collective bargaining agreement[2] by honoring the picket line established by the Arkansas City employees. The clause provides that:

Provisions having been made by this Agreement and local agreements for the peaceful and orderly settlement of any disputes which may arise between Company and the Union or local Unions or any Employee or Employees, it is agreed that during the term of this Agreement there shall be no strike, stoppage, slowdown, or suspension of work on the part of the Union or any local Union or any Union member or lockout on the part of the Company on account of such disputes until after an earnest effort shall be made to settle all such matters in the manner provided in the respective agreements.

(1985–88 Sioux Falls Collective Bargaining Agreement, Article II, cl. 5).

After an expedited evidentiary hearing, the district court granted Morrell preliminary injunctive relief. Upon expedited appeal to this court, we vacated the injunction[3] because the strikes were sympathy strikes,[4] as opposed to economic strikes,

---

1. The Honorable Richard H. Battey, United States District Judge for the District of South Dakota.

2. Selected provisions of the Sioux Falls collective bargaining agreement are set out in an Addendum following this opinion.

3. The district court found that the August 15 strike was not a sympathy strike but was actually a *protest* over Morrell's disciplinary actions toward workers who had honored the August 4 strike. Since the court found that this was a strike over an arbitrable grievance, it could be enjoined under the narrow exception to the stat-

utory prohibition against enjoining strikes announced in *Boys Markets v. Retail Clerks Union, Local 770*, 398 U.S. 235, 253, 90 S.Ct. 1583, 1594, 26 L.Ed.2d 199 (1970). Upon appeal, this court found "no evidence in the record" to support the district court's conclusion that the August 15 strike was not a sympathy strike. *John Morrell & Co. v. Local Union 304A of the United Food & Commercial Workers*, 804 F.2d 457, 461–62 (8th Cir.1986) (per curiam), *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987).

4. An economic strike is a "cessation of work by employees to enforce economic demands upon the employer in contrast to a strike caused by

and thus could not be enjoined under the Norris–LaGuardia Act, 29 U.S.C. § 104 (1988). *John Morrell & Co. v. Local Union 304A of the United Food & Commercial Workers,* 804 F.2d 457 (8th Cir.1986) (per curiam), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987). After remand to consider Morrell's claim for damages, and while discovery was in progress, employees of the Sioux City, Iowa plant also commenced a lawful strike in an effort to obtain a new collective bargaining agreement. The Sioux City workers picketed the Sioux Falls plant, as the Arkansas City workers had done, and the Sioux Falls workers again honored the picket line. This strike at the Sioux Falls plant lasted from May 1 to November 4, 1987. Morrell then filed an amended complaint seeking damages based on that most recent strike, and that case was consolidated with the other pending actions.

Upon the Unions' motion for summary judgment, the district court[5] ruled both that the refusal by the Sioux Falls workers to cross the picket line in 1987 was a sympathy strike in support of the Sioux City workers, as opposed to an economic strike, and that it was for a jury to decide whether the collective bargaining agreement barred such strikes. The case was then transferred to the Western Division of the District of South Dakota where the court reconsidered the Unions' motion for summary judgment and held that a jury should decide both: (1) whether the 1987 strike was a sympathy strike; and (2) whether the no-strike provision of the collective bargaining agreement prohibited sympathy strikes.

The case then proceeded to trial before a jury. The Unions moved for a directed verdict based upon their assertion that, as a matter of law, the collective bargaining agreement did not bar sympathy strikes. The motion was denied. The case was submitted to the jury on special interrogatories and, on March 10, 1988, the jury returned a verdict for Morrell on liability because it found that: (1) the 1987 strike was a sympathy strike; and (2) the Sioux Falls workers were prohibited from engaging in sympathy strikes by the no-strike provision in the agreement.

After the 1987 sympathy strike had concluded, but before this jury verdict, the Sioux Falls workers sought to return to work and replace the workers hired in their absence. Morrell refused to recall the strikers. The Unions filed grievances on behalf of these workers in which they argued that the collective bargaining agreement permitted sympathy strikes and that the agreement's seniority provisions required Morrell to rehire the sympathy strikers in place of less-senior replacements. Morrell denied the grievances, and the Unions sought arbitration of the issue.

After the liability phase of the jury trial had concluded, but during the damages phase of the trial, the arbitrator issued an award in favor of the Unions which sustained the grievances. Despite the earlier jury verdict that the no-strike clause prohibited sympathy strikes, the arbitrator independently examined the meaning of the no-strike clause and concluded that it did not waive the workers' right to engage in sympathy strikes. Based upon this ruling, the arbitrator held that the strikers were entitled to exercise their seniority rights and replace the workers hired during the sympathy strike.

The arbitration award was issued on November 5, 1988, and the damages phase of the jury trial concluded on November 10, 1988. The jury awarded Morrell $24.6 million in damages based upon lost profits during the strike period.

Morrell then filed a motion to vacate the arbitration award and the Unions filed a motion to enforce the award. The two actions were consolidated. The district court vacated the award because it held that the arbitrator had exceeded his authority by deciding the issue of the legality of

an unfair labor charge." *Black's Law Dictionary* 1276 (5th ed.1979). "A sympathy strike involves two unions; one is striking to force some concession from the employer; the other strikes in sympathy with the first's objectives. Sympathy strikes are a common manifestation of traditional union solidarity." *Id.*

5. The Honorable John B. Jones, United States District Judge for the District of South Dakota.

sympathy strikes since Morrell had not consented to arbitrate that issue. Alternatively, the court held that the award should be set aside because the doctrine of res judicata bound the arbitrator to the jury's resolution of the issue during the liability phase of the trial. The Unions now appeal the court's judgment vacating the arbitration award. We will discuss their arguments and provide further factual details as raised in the context of these issues.

## I.

The Unions contend that the district court should not have allowed the jury to determine the legal effect of the no-strike clause on the Sioux Falls workers' right to engage in a sympathy strike. They advance several arguments in support of this contention and we will consider each in turn. They also challenge the court's ruling that a Morrell internal memorandum offered into evidence by the Unions was protected by attorney-client privilege.

### A.

█ We begin by determining the effect of our earlier decision, 804 F.2d 457, on the issues raised in this appeal. The Unions urge that this earlier opinion held that the Sioux Falls collective bargaining agreement did not bar their right to participate in sympathy strikes. They specifically rely upon the following language: "To the extent that the district court found that the first strike was a sympathy strike, that the parties' no-strike clause did not prohibit sympathy strikes, and that the August 4 strike could not be enjoined by a federal court, we agree with the district court's analysis." *Id.* at 460. The Unions also point to language in the opinion stating that the Sioux Falls workers, by agreeing to return to work after the Arkansas City workers' picketing, did not waive the "right to engage in further lawful strike activity." *Id.* at 461 n. 5.

This panel is bound by Eighth Circuit precedent. *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1240–41 n. 4 (8th Cir.1990). We need not follow dicta, however, and we are satisfied that the language identified by the Unions in our earlier *Morrell* opinion was not essential to the judgment in that case. The only issue presented on the expedited appeal there was whether the Unions had engaged in a sympathy strike, which could not be enjoined under the Norris–LaGuardia Act, rather than an economic strike, which could be enjoined. The court was not called upon to decide whether the collective bargaining agreement barred sympathy strikes; rather, we merely had to determine whether a sympathy strike had occurred. Furthermore, our earlier decision expressly refrained from deciding the merits of Morrell's damages claim. 804 F.2d at 462 n. 7. We therefore conclude that our first *Morrell* opinion is not decisive on the issue of the impact of the no-strike clause on sympathy strikes.

### B.

█ We must next determine what standard should guide our review of the district court's decision that the no-strike clause was ambiguous. The Unions argue that this determination is subject to de novo review, while Morrell vigorously maintains that we must defer to the court's analysis under the clearly erroneous standard.

We believe that deciding whether contractual language is ambiguous is a question of law which we review de novo; however, to the extent that we review factual findings made by the district court, we apply the clearly erroneous standard. Judicial precedent supports our conclusion. *See Local Union No. 150–A, United Food & Commercial Workers Int'l Union v. Dubuque Packing Co.,* 756 F.2d 66, 69 (8th Cir.1985); *Press Mach. Corp. v. Smith R.P.M. Corp.,* 727 F.2d 781, 784 (8th Cir. 1984); *Motor Carriers Council v. Local No. 600, Affiliate of Int'l Bhd. of Teamsters,* 486 F.2d 650, 653 (8th Cir.1973). Moreover, the cases cited by Morrell are not inconsistent with our conclusion. *See Arkansas Rice Growers Coop. Ass'n v. Alchemy Indus.,* 797 F.2d 565, 567 (8th Cir.1986) (stating that the construction of a contract is a question of law but review of disputed extrinsic evidence is governed by the clearly erroneous standard); *Landro v.*

*Glendenning Motorways,* 625 F.2d 1344, 1352 (8th Cir.1980) (examining factual findings under the clearly erroneous standard after determining that the contract was ambiguous).

### C.

We now apply these standards to the issues before us. The Unions assert that the district court should not have submitted the question of whether the no-strike clause barred sympathy strikes to the jury or admitted extrinsic evidence for interpretive purposes because the clause is unambiguous. They also assert that the evidence was insufficient to support a verdict in favor of Morrell. We believe it would be helpful at this point to set out some basic principles of contract law and labor law to aid in our resolution of these issues.

 Extrinsic evidence may not be considered "for the purpose of showing that the parties intended to make an agreement which is inconsistent with the unambiguous words of their written contract." *St. Louis Union Trust Co. v. United States,* 617 F.2d 1293, 1300 (8th Cir.1980). Although extrinsic evidence may not be admitted to contradict the parties' intentions as expressed in the writing, it can be admitted to demonstrate that ambiguity exists. *Press Mach. Corp.,* 727 F.2d at 784–85; S. Williston, *A Treatise on the Law of Contracts* § 600A, at 299–310 (3d ed. 1961). To determine whether there is an ambiguity, we must examine the relevant extrinsic evidence and decide whether the contractual language is reasonably susceptible of the meaning proposed by the party asserting the ambiguity. *The Realex Chemical Corp. v. S.C. Johnson & Son,* 849 F.2d 299, 302 (8th Cir.1988). If we decide that the language is ambiguous,

then resolution of the ambiguity is a question of fact to be determined by the jury. *Thomas v. Bakery, Confectionery & Tobacco Workers Union Local No. 433,* 826 F.2d 755, 764 (8th Cir.1987), *cert. denied,* 484 U.S. 1062, 108 S.Ct. 1019, 98 L.Ed.2d 984 (1988); *Press Mach. Corp.,* 727 F.2d at 784; Williston, *supra* § 616, at 652. The jury may properly consider extrinsic evidence in resolving the ambiguity.[6] *Press Mach. Corp.,* 727 F.2d at 784.

 We must apply these principles of contract law in the context of the labor law principles implicated here. Section 7 of the National Labor Relations Act, 29 U.S.C. § 157 (1988), generally grants employees the right to engage in sympathy strikes in support of a lawful strike by another union.[7] *Amcar Div., ACF Indus. v. NLRB,* 641 F.2d 561, 566 (8th Cir.1981). This right may be waived expressly or impliedly; however, an implied waiver must be established only by "clear and unmistakable" evidence. *Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983). "In determining whether there has been a waiver of the right to engage in sympathy strikes, the collective bargaining agreement must be interpreted as a whole and in light of the law relating to it when made." *Amcar,* 641 F.2d at 566–67. *Amcar* also instructs us that:

> There are a number of relevant facts to examine in determining whether the Union intended to waive its right to engage in sympathy strikes. We look to the language of the contract, the structure of the contract, the bargaining history, and any other relevant conduct of the parties that shows their understanding of the contract.

*Id.* at 567. *See also Iowa Beef Processors v. Amalgamated Meat Cutters,* 597 F.2d

---

**6.** The Unions appear to argue that juries may use extrinsic evidence to interpret only unconditional, but not conditional, no-strike clauses. We see no basis in the law for such a distinction.

**7.** It is not certain that this right extends to situations where the picket line is unrelated to the union that wants to honor it. *See* Brod,

*Through the Window of Legislative History: A View on the Employees' Statutory Right to Honor a Stranger Picket Line,* 35 Kansas L.Rev. 9, 31 (1986) (suggesting that the Eighth Circuit, in *NLRB v. L.G. Everist, Inc.,* 334 F.2d 312 (8th Cir.1964), appears to have decided that honoring a stranger picket line is not protected by the National Labor Relations Act).

1138, 1144 (8th Cir.) (examined language, external circumstances, and policy considerations to determine whether the right had been waived), *cert. denied,* 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979).

■ Thus, we must next decide whether the no-strike clause is "ambiguous" in the sense that it is reasonably susceptible of the meaning proposed by Morrell, namely, that the Unions, in clear and unmistakable terms, waived their right to engage in sympathy strikes. Once we determine that the language is susceptible of this interpretation, then the issue is submitted to the jury[8] to resolve the ambiguity and decide if waiver has occurred. The Unions rely upon *Barrett v. Safeway Stores,* 538 F.2d 1311, 1313 (8th Cir.1976) (per curiam), for the proposition that the contractual language here was unambiguous as a matter of law. We reject the comparison. "[F]or an unresolved ambiguity to constitute a genuine factual issue, we believe that the record as a whole must permit a rational trier of fact to find for the nonmoving party." *Realex,* 849 F.2d at 302. As stated previously, we may review extrinsic evidence in making this determination and, upon doing so, we are convinced that this standard was satisfied.

The Unions argue that an examination of extrinsic evidence still does not yield an ambiguity. They contend that the no-strike provision is expressly linked to the grievance-arbitration procedure and, therefore, it applies only to strikes over arbitrable disputes. The arbitrator, who considered the meaning of the no-strike clause as well as the recall issue, was persuaded by this "coterminous application" argument. He stated that:

This clause clearly references and contemplates a direct connection with the arbitration provisions of the contract. It states that provisions have been made for "peaceful and orderly settlement of any disputes" which may arise between the Company and the Union. It then states "there shall be no strike ... *on account of such disputes.*" ... Thus, the contract itself expresses the doctrine of coterminous application. If this were not enough—and the Arbitrator thinks it is—the contract also conditions the promise not to strike on exhaustion of contractual efforts to settle the dispute. Since there are no available means under the contract for settling a primary dispute involving a separate bargaining unit with an expired contract, *sympathy strikes are clearly allowed.*

(Award of Arbitrator, Nov. 5, 1988, at 16–17) (emphasis added).

We are not similarly convinced. The doctrine of coterminous interpretation arose in the context of collective bargaining agreements that contained an arbitration clause but lacked an express no-strike clause. In *Local 174, Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), the parties' agreement did not have a no-strike provision, but the Supreme Court nevertheless held that the express arbitration clause created an implied duty not to strike over disputes subject to arbitration. *Id.* at 105, 82 S.Ct. at 577. The union in *Lucas Flour* was thus liable for damages flowing from breach of the implied duty to refrain from striking. The Supreme Court has also applied the doctrine of coterminous interpretation in the injunction context to hold that an agreement, containing an arbitration clause but not a no-strike clause, created an implied

---

8. The jury instruction, which the parties did not object to, correctly required Morrell to prove, by a preponderance of the evidence, that the Unions had clearly and unmistakably waived their right to engage in sympathy strikes. The instruction provided, in part, that:

Even if you should decide that the strike was in fact a sympathy strike, the plaintiff Morrell may still be entitled to a verdict should you find by a preponderance of the evidence that the defendants, *clearly and unmistakably, waived, relinquished, or gave up*

*the right* to engage in such sympathy strikes when they signed a collective bargaining agreement with Morrell November 20, 1985....

In determining this issue you are entitled to examine the contract language, the structure of the contract, the bargaining history and other relevant evidence which the Court admits for your consideration on the issue of the intent of the parties.

(Appellant's Appendix, Vol. I, at 124) (emphasis added).

no-strike duty and, therefore, that a court could enjoin the strike. *Gateway Coal Co. v. UMW,* 414 U.S. 368, 382, 94 S.Ct. 629, 639, 38 L.Ed.2d 583 (1974).

■■■] These decisions, however, do not compel the conclusion that the doctrine of coterminous interpretation applies to the situation before us. We are not faced with an agreement lacking a no-strike clause, as in *Lucas Flour,* nor do we have to determine the availability of injunctive relief, as in *Gateway Coal.* The issue confronting us is whether the parties' express no-strike provision has been breached so that the Unions are liable for damages. The Supreme Court has recognized that a strike which is not subject to injunction under the Norris–LaGuardia Act may nevertheless violate the parties' no-strike clause and subject the striking party to other remedies, such as damages. *Buffalo Forge Co. v. United Steelworkers,* 428 U.S. 397, 410–11, 96 S.Ct. 3141, 3148–49, 49 L.Ed.2d 1022 (1976). *See also Jacksonville Bulk Terminals v. International Longshoremen's Ass'n,* 457 U.S. 702, 721–22, 102 S.Ct. 2672, 2684–85, 73 L.Ed.2d 327 (1982) (stating that the issue of whether the strike was enjoinable is separate from the issue of whether the no-strike clause was violated).

In light of this precedent, we have previously distinguished between express and implied no-strike clauses, and held that the coterminous interpretation doctrine limited the effect of no-strike clauses to arbitrable disputes only in the latter case.[9] *Iowa Beef Processors,* 597 F.2d at 1145. If an agreement contains an express no-strike clause, then "the no-strike provision must be interpreted in light of the whole contract, rather than by looking only to the

arbitration clause." *Id.* We stated that the issues raised by the arbitration and no-strike clauses remained analytically distinct, *id.,* and further stated that, "[u]ltimately, each depends on the intent of the contracting parties." *Id.* (quoting *Gateway Coal Co. v. UMW,* 414 U.S. 368, 382, 94 S.Ct. 629, 639, 38 L.Ed.2d 583 (1974)). We do not believe that the *Iowa Beef Processors* holding is limited to cases involving broad no-strike clauses. Such a litmus test would not yield a result founded upon the intent of the parties.

The cases cited by the Unions do not require a contrary conclusion. While *Gary Hobart Water Corp. v. NLRB,* 511 F.2d 284 (7th Cir.), *cert. denied,* 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975), applied the doctrine of coterminous interpretation to an express no-strike clause, that case must be read in light of the Seventh Circuit's later decision in *United States Steel Corp. v. NLRB,* 711 F.2d 772 (7th Cir.1983), where the court refused to apply the doctrine when the extrinsic evidence indicated that the parties intended otherwise. *Id.* at 778–80. Similarly, in *Pacemaker Yacht Co. v. NLRB,* 663 F.2d 455 (3d Cir.1981), the Third Circuit refused to interpret a no-strike clause coterminously with the arbitration clause after examining the agreement as a whole, the statements of union officials, and the state of the law when the agreement was executed. *Id.* at 458–59. *See also NLRB v. Gould, Inc.,* 638 F.2d 159, 164 (10th Cir.1980) (applying the coterminous interpretation doctrine to an express no-strike clause after finding that there was no extrinsic evidence to indicate that the parties intended to the contrary),

---

9. Other circuits have also reached this conclusion. The Sixth Circuit, in *Ryder Truck Lines v. Teamsters Freight Local Union No. 480,* 727 F.2d 594 (6th Cir.) (en banc), *cert. denied,* 469 U.S. 825, 105 S.Ct. 103, 83 L.Ed.2d 48 (1984), provides an excellent discussion of the doctrine of coterminous application and concludes that "no-strike clauses need not be construed narrowly to prohibit strikes only over arbitrable disputes." *Id.* at 601. The court declared that:

> Indeed, to hold that no-strike clauses must be construed as prohibiting only strikes over arbitrable issues would undermine the fundamental premise of freedom of contract on

which federal labor policy is based by undercutting management's ability to obtain "an across-the-board no-strike clause and labor's ability to gain concessions in return for such a pledge."

*Id.* (quoting *Pacemaker Yacht Co. v. NLRB,* 663 F.2d 455, 460 (3d Cir.1981)). In *United States Steel Corp. v. NLRB,* 711 F.2d 772 (7th Cir.1983), the Seventh Circuit held that the question of whether a no-strike clause barred sympathy strikes was to be answered by examining the contract and bargaining background, rather than by applying the principle of coterminous application. *Id.* at 776–78.

*cert. denied,* 452 U.S. 930, 101 S.Ct. 3065, 69 L.Ed.2d 430 (1981).

We are satisfied that the doctrine of co-terminous application does not govern our interpretation of the no-strike clause before us. Rather, we are to determine the scope of the clause by examining the language of the agreement and the external circumstances of the controversy. *Iowa Beef Processors,* 597 F.2d at 1144.

We now turn to the extrinsic evidence offered by Morrell in support of its interpretation of the no-strike clause. At a hearing before the district court, Morrell identified other provisions of the collective bargaining agreement indicating that the parties wanted the no-strike provision to apply to sympathy strikes. Paragraph 3 of Article II of the agreement declares that the agreement shall "establish the means to facilitate peaceful adjustments of *all grievances or other disputes* that may arise between the Company and the Union." (Emphasis added). The Unions claim that this language is merely hortatory, but we are not convinced. It is well-established that, "[i]n interpreting a collective bargaining agreement, ... we must construe the contract as a whole." *Amcar,* 641 F.2d at 569. *See also United States Steel Corp.,* 711 F.2d at 778 (examining the introductory provisions of the collective bargaining agreement to determine the parties' intent in a no-strike clause).

Morrell also argues that the "struck work" clause in paragraph 6 of Article II supports its interpretation. This provision allows Sioux Falls workers to refuse to perform work transferred from striking plants of other employers but expressly obligates the workers to accept work transferred from another Morrell plant which is on strike. That protection would be rendered meaningless if Sioux Falls employees could avoid their contractual duty to accept work from striking plants by simply engaging in a sympathy strike.

Furthermore, Morrell supported its position by presenting evidence of the parties' bargaining history. There was evidence that a union negotiator believed that the earlier no-strike clause, which was in effect from 1954 to 1956, barred all strikes. In 1956, Morrell proposed the no-strike clause which is currently in effect and before this court. It would be irrational to suggest that Morrell intended to limit the reach of the no-strike clause rather than maintaining the status quo.

In sum, we are satisfied that Morrell presented sufficient extrinsic evidence to establish that the no-strike clause was susceptible to the meaning that it proposed. Therefore, the district court properly allowed the jury to decide the issue of whether the Unions waived their right to engage in sympathy strikes in clear and unmistakable terms.

■ Alternatively, the Unions argue that the jury's verdict was not supported by the evidence. In considering this challenge, we must bear in mind that "[e]vidence is to be considered in the light most favorable to the verdict," *Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.,* 819 F.2d 1471, 1485 (8th Cir.1987), and that we may overturn the jury's verdict only if "the evidence is susceptible to no reasonable inferences sustaining it," *id.* Under this demanding standard, our review of the evidence compels us to conclude that the jury verdict must stand.

Morrell provided evidence of the 1982 and 1985 contract negotiations.[10] During the 1982 negotiations, a Morrell negotiator stated that the company was considering proposing a change to the no-strike provision because of unauthorized strikes at other plants. A negotiator for the Unions responded that the current no-strike clause sufficiently protected the company. Morrell's negotiator then agreed that no changes were needed. While the Unions argue that this discussion referred to wildcat strikes and slowdowns, and not to sym-

---

10. The Unions complain that Morrell failed to present any evidence of the circumstances in 1956 leading to the inclusion of the current no-strike clause. We have recognized, however, on a previous occasion, that the reasons for lack of change may be more significant than the circumstances surrounding the original negotiations. *Amcar,* 641 F.2d at 567.

pathy strikes, it nevertheless evidences the parties' intent to resolve disputes through the grievance and arbitration process and to avoid strikes.

Evidence of the 1985 negotiations is even more powerful. There was testimony that the Unions repeatedly proposed changes in the collective bargaining agreement which would explicitly permit sympathy strikes. All such proposals were rejected by Morrell. Morrell adamantly refused such requests because the changes would essentially eviscerate Article II of the agreement.

The Unions concede that they sought to insert language permitting sympathy strikes and barring the transfer of work from plants on strike. They contend, however, that such changes were sought for all employees of packing houses represented by the International and local unions. They also argue that such proposals were not admissions but merely manifested a desire for explicit assurance of pre-existing rights. We note initially that this argument appears to indicate that the language was ambiguous. Regardless, we have previously declared that "an attempt by the Union to add such a [sympathy strike] provision is significant in inferring that the Union ... waiv[ed] its right to engage in sympathy strikes." *Amcar*, 641 F.2d at 567 (citing *NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 79–80, 73 S.Ct. 519, 524–25, 97 L.Ed. 832 (1953)), which considered the union's proposal to expressly permit refusals to cross a picket line as evidence of the parties' intent in their no-strike clause). These arguments were before the jury, and when we view this evidence in the light most favorable to the verdict, we conclude that the jury's verdict must be sustained.

### D.

▆▆▆▆▆ The Unions also challenge an evidentiary ruling that the district court made during the liability phase of the trial. The court held that an internal memorandum written by Morrell's general counsel, which came into the Unions' possession because of another lawsuit, was protected by attorney-client privilege. We affirm the court's ruling on this issue.

Prior to the action before us, a group of Morrell employees at another plant brought a class action against Morrell and the United Food and Commercial Workers International Union, one of the unions involved in this appeal, concerning a plant closing. *See Aguinaga v. United Food & Commercial Workers Int'l Union*, 720 F.Supp. 862 (D.Kan.1989); *Aguinaga v. John Morrell & Co.*, 713 F.Supp. 368 (D.Kan.1988); *Aguinaga v. John Morrell & Co.*, 602 F.Supp. 1270 (D.Kan.1985). Morrell reached a settlement with the employee class but the International Union filed cross-claims against Morrell. Morrell and the employee class entered into a joint defense agreement whereby Morrell gave the employees access to seventeen privileged documents for use in their case against the International Union. Morrell waived its privilege as to four of these documents for use at trial. Five more of the documents, however, came into the International Union's possession when the employees' expert witness turned over files at his deposition. As a result, the International Union gained access to the internal memorandum in issue here, which is referred to as the Gass memorandum. The district court ruled that the document was shielded by attorney-client privilege and the doctrine of work-product immunity. It held that Morrell's waiver of privilege as to the initial four documents did not constitute a waiver as to the remaining documents. Therefore, the five documents which inadvertently came into the International Union's hands, including the Gass memorandum, were inadmissible in the *Aguinaga* case.

The Unions in this appeal sought to introduce the Gass memorandum into evidence in the district court below for the purpose of showing Morrell's belief that the no-strike clause did not prohibit sympathy strikes. The court below also held that attorney-client privilege barred admission of the evidence.

The *Aguinaga* employees and Morrell shared a joint defense privilege by virtue of

being aligned on the same side following their settlement and the International Union's cross-claims. *See Medcom Holding Co. v. Baxter Travenol Laboratories,* 689 F.Supp. 841, 844 (N.D.Ill.1988); *Western Fuels Ass'n v. Burlington N. R.R.,* 102 F.R.D. 201, 203 (D.Wyo.1984). "[W]hen information is exchanged between various co-defendants and their attorneys[,] ... this exchange is not made for the purpose of allowing unlimited publication and use, but rather, the exchange is made for the limited purpose of assisting in their common cause." *Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.,* 559 F.2d 250, 253 (5th Cir.1977) (per curiam). It is fundamental that "the joint defense privilege cannot be waived without the consent of all parties to the defense." *Ohio–Sealy Mattress Mfg. Co. v. Kaplan,* 90 F.R.D. 21, 29 (N.D.Ill.1980); *see also Western Fuels Ass'n,* 102 F.R.D. at 203.

Thus, neither the *Aguinaga* employees nor its counsel could waive the privilege on Morrell's behalf, and there is no evidence that Morrell itself waived the privilege. As the *Aguinaga* court held, Morrell's waiver as to four documents did not waive its privilege as to the rest. The fact that the Unions inadvertently gained access to the other documents does not affect this ruling.

The Unions argue that Morrell waived its privilege by allowing its general counsel to testify in the *Aguinaga* trial concerning one of the four documents which Morrell had agreed to release. While the Unions correctly recognize that a waiver of privilege as to one communication may extend to other communications relating to the same subject matter, *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982) (per curiam); *United States v. Cote,* 456 F.2d 142, 144–45 (8th Cir.1972), this argument is unavailing here. The released document neither involves sympathy strikes nor the no-strike clause. The documents

were insufficiently linked for waiver as to one to constitute waiver as to the other.

## II.

The Unions challenge several aspects of the damages phase of the trial. First, they contend that the district court should not have excluded either evidence offsetting damages due to the lower wage rates of the replacement workers, or evidence of an Occupational Safety and Health Administration (OSHA) report discussing conditions at the Sioux Falls plant. Second, they argue that Morrell failed to prove that its damages were contemplated by the contract. Finally, they contend that the damages verdict was speculative. We will consider these claims of error separately.[11]

### A.

Morrell claimed damages only for its profit lost during the strike. At trial, the Unions attempted to present evidence that Morrell's losses due to the strike were partially offset by the lower wages Morrell paid replacement workers after the strike. The district court excluded the evidence under Federal Rule of Evidence 403.

The Sioux Falls collective bargaining agreement allowed Morrell to pay lower wages to employees who had worked for Morrell for less than one and one-half years. Morrell paid the 2,200 replacement workers this lower rate, and the Unions contend that the damage award should be reduced to reflect the difference between the cost of paying the old workers and the cost of paying the replacement workers. This argument is directed solely at post-strike labor savings. At trial, the Unions were credited with all strike-related cost savings, including the lower wage rate paid during the strike, in determining Morrell's total damages during the strike period. (Tr. 1702–06).

We note initially the well-established principle that a "trial court's exclu-

**11.** The Unions assert other prejudicial errors based on the following: (1) the court referred to the Unions' conduct as "illegal;" (2) Morrell was permitted to show that the Unions intended to injure the company; (3) the Unions were not

permitted to explain that the contract breach was a sympathy strike; and (4) Morrell was allowed to present evidence about violence at another striking plant. We reject these claims, and they do not merit further discussion.

sion of evidence under Fed.R.Evid. 402 and 403 is entitled to substantial deference on review." *Hawkins v. Hennepin Tech. Center,* 900 F.2d 153, 155 (8th Cir.1990). We also recognize that, where the defendant's breach of contract has conferred some benefit upon the plaintiff, the doctrine of offsetting damages calls for the amount of the plaintiff's damages to be reduced by the amount of the benefit received. *Macon–Bibb County Water & Sewage Auth. v. Tuttle/White Constr.,* 530 F.Supp. 1048, 1055 (M.D.Ga.1981); *Louisiana Sulphur Carriers v. Gulf Resources & Chemical Corp.,* 53 F.R.D. 458, 461–62 (D.Del.1971); D. Dobbs, *Handbook on the Law of Remedies* § 3.6, at 181 (1973). We are satisfied, however, that the district court did not err in excluding evidence of labor savings for the time period following the strike. The Unions, as the breaching party, have the burden of proving that "the breach resulted in a direct and immediate savings to the plaintiff," *Macon–Bibb,* 530 F.Supp. at 1055, and they have failed to meet this burden. Just as the plaintiff must prove his damages with reasonable certainty, Dobbs, *supra* § 3.3, at 148, the defendant must prove the amount of the offset with reasonable certainty, *id.* § 3.6, at 185.

The evidence offered by the Unions' expert on the offset issue focused solely on one cost component: labor costs. This self-serving analysis failed to examine the total economic effect of the breach upon Morrell. *See Lewis v. Benedict Coal Corp.,* 259 F.2d 346, 353 (6th Cir.1958) (holding that the damage "formula was erroneous because it measured only increased costs rather than actual profit or loss"), *modified on other grounds,* 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960). Furthermore, the evidence offered to show the effect of replacement worker wage rates on labor costs was speculative. The Unions' expert assumed that all post-strike labor cost savings were solely attributable to hiring replacement workers. He did not consider the impact of factors such as changes in productivity, capital improvements, or product mix. The expert would not even commit to a "ballpark" estimate of the effect of the offset

on Morrell's damages. (Appellee's Appendix at 149–50, 178, 181–85).

In sum, we are satisfied that the Unions failed, as a matter of law, to meet their burden on this issue. Therefore, we hold that the district court did not err by excluding this evidence.

### B.

■■■ At trial, the Unions offered into evidence a report by OSHA investigators concerning conditions at the Sioux Falls plant. The court excluded the evidence under Federal Rule of Evidence 403, and the Unions now challenge this ruling.

According to the Unions, the OSHA report provided evidence that the plant was violating OSHA requirements by assigning too few workers for difficult tasks, providing inadequate tools or equipment, and operating conveyor chains at excessive speeds. The Unions argue that this supports their theory that replacement workers were unable to achieve the desired performance levels because of plant conditions, and not as a result of the strike.

We review the district court's ruling with substantial deference, *Hawkins,* 900 F.2d at 155, and conclude that there was no error in excluding this evidence. The Unions argue that Morrell's damages resulting from operating in violation of law are not recoverable. *See Gibbs v. UMW,* 343 F.2d 609, 618 (6th Cir.1965), *rev'd on other grounds,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). We reject the OSHA report as evidence on this theory because it contained merely unproven allegations of violations. Furthermore, the Unions failed to establish the necessary causal link between lost profits and safety violations. Therefore, we conclude that the court correctly determined that this evidence was insufficiently probative to outweigh the potential for prejudice.

### C.

The Unions argue that Morrell failed to prove that its damages claims were contemplated by the parties in their collective bargaining agreement. They correctly as-

sert that Morrell's damages award may consist only of "the actual loss sustained ... as a direct result of the breach and which may reasonably be supposed to have been in the contemplation of the parties as the probable result of such a breach at the time the agreement was made." *Eazor Express v. International Bhd. of Teamsters,* 520 F.2d 951, 966 (3d Cir.1975), *cert. denied,* 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976). We are satisfied, however, that Morrell's damages award meets this standard.[12]

■ The Unions contend that the parties had not contemplated damage claims for worker inexperience and inefficiency. In support of this, they identify a contractual provision requiring all workers to become objectively "qualified" for a job within two weeks. A union official testified that workers can become "qualified" for any job in the plant within two weeks. Based upon this, the Unions claim that Morrell should not be permitted to recover damages resulting from other subjective measures of replacement worker efficiency.

■ This argument is patently untenable. The contract provision to which the Unions refer concerns Morrell's ability to transfer employees between departments and does not support the proposition that a worker can efficiently perform any job in the plant, including skilled butchering, within two weeks. It was the jury's function, not this court's, to weigh the value and credibility of the union official's testimony on worker efficiency. Furthermore, we reject the Unions' assertion that the contractual provision authorizing lower wages for new workers was intended by the parties to be a form of liquidated damages.

■ We also reject the Unions' argument that losses suffered by Morrell's distribution centers, which are warehouses selling Morrell products, were unrecoverable. It was within the contemplation of the parties that a strike slowing down production at the Sioux Falls plant would adversely affect distribution centers selling Sioux Falls products, and thus such losses were properly recoverable.

D.

■ Finally, the Unions argue that Morrell's damages verdict was the product of guesswork and speculation. They assert that Morrell's damages expert did not provide sufficient guidance to the jury because he testified as to alternative methods of assessing lost profits without providing a basis to distinguish among them. We also believe that this argument lacks merit.

■ Evidence of damages is sufficient as long as it is "not wholly speculative," *Pillsbury Co. v. Illinois Cent. Gulf R.R.,* 687 F.2d 241, 246 (8th Cir.1982), and permits the jury to "approximate damages on the basis of just and reasonable inferences." *Wagner Elec. Corp. v. Local 1104, Int'l Union of Elec. Workers,* 496 F.2d 954, 957 (8th Cir.1974). Moreover, we may not reverse the district court's admission of expert testimony absent "a clear and prejudicial abuse of discretion." *Delta Rice Mill v. General Foods Corp.,* 763 F.2d 1001, 1003 (8th Cir.1985) (quoting *SCNO Barge Lines v. Anderson Clayton & Co.,* 745 F.2d 1188, 1192 (8th Cir.1984)).

■ Lost profits are properly recoverable in actions in which unions are found to have violated their no-strike clause. *See, e.g., California Trucking Ass'n v. Brotherhood of Teamsters,* 679 F.2d 1275, 1289–90 (9th Cir.1981), *cert. denied,* 459 U.S. 970, 103 S.Ct. 299, 74 L.Ed.2d 281 (1982); *Iowa Beef Processors,* 597 F.2d at 1146. This court will not review "the merits of various methods of calculation, so long as the method actually employed by the district court is designed to yield a reasonable approximation of damages." *Frito–Lay v. Local Union No. 137, Int'l Bhd. of Teamsters,* 623 F.2d 1354, 1364 (9th Cir.), *cert. denied,* 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980).

**12.** Morrell claims that the Unions waived this foreseeability argument by failing to object at trial to Morrell's offers of proof on these damages claims. We need not decide this issue, however, because we reject the Unions' argument on other grounds.

Essentially, the expert's approach involved projecting the plant's sales and profits based upon historical data, determining the extent to which external factors had an impact on profits, adding strike-related losses such as decreased profits at the distribution centers, and deducting expenses which Morrell saved as a result of the strike. We believe that this method allowed the jury to "approximate damages on the basis of just and reasonable inferences." *Wagner Elec.*, 496 F.2d at 957. It was not error to permit the expert to discuss eight models of damage calculations with a range of estimates from $20 million to $31 million. The expert provided sufficient guidance by explaining the different assumptions upon which each model was premised.

We also note that the Unions extensively cross-examined Morrell's expert and offered their own expert testimony on the damages issues. We are compelled to conclude that Morrell's damages evidence was properly before the jury and provided it with the guidance necessary to determine damages. *See Iowa Beef Processors*, 597 F.2d at 1146.

### III.

Finally, the Unions argue that the district court erred in vacating the arbitration award. As we have said, the parties sought arbitration on the issue of whether the strikers were entitled to replace the workers hired during the strike because they were protected by the seniority provisions of their collective bargaining agreement. The arbitrator issued an award after the liability phase of the bifurcated trial, but before the damages phase had concluded. The award sustained the Union's grievances, ordered the reinstatement of the strikers, and held that the sympathy strikers did not violate the no-strike clause of the collective bargaining agreement.

Despite the earlier jury verdict expressly holding that the no-strike clause barred sympathy strikes, the arbitrator believed that he needed to independently interpret the clause because the reinstatement issue was fundamentally linked to the breach of contract issue. The arbitrator applied the doctrine of coterminous interpretation to hold that the no-strike clause barred only strikes over arbitrable matters, and therefore, did not prohibit sympathy strikes. Morrell then asked the district court to set aside the arbitration award, and the court granted the request. It held that the arbitrator had exceeded the scope of his authority and, alternatively, that the doctrine of res judicata bound the arbitrator. Since this issue is a question of law, we review de novo the district court's decision to vacate the award. *Nordin v. Nutri/System*, 897 F.2d 339, 344 (8th Cir. 1990). After carefully examining the record, we are satisfied that the district court did not err in this regard.

### A.

"We begin by recognizing that where parties to a collective bargaining agreement have provided that an arbitrator's award shall be final and binding, the award is generally non-reviewable by a court." *Trailways Lines v. Trailways, Inc. Joint Council*, 807 F.2d 1416, 1420 (8th Cir.1986). "As long as the arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his own brand of industrial justice,' the award is legitimate." *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 36, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987) (quoting *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)). This deference means that "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Misco*, 484 U.S. at 38, 108 S.Ct. at 371.

While our review of an arbitration award is narrowly circumscribed, this judicial deference "does not grant carte blanche approval to any decision an arbitrator might make." *Piggly Wiggly Operators' Whse. v. Piggly Wiggly Operators'*

*Whse. Indep. Truck Drivers Union, Local No. 1,* 611 F.2d 580, 583 (5th Cir.1980). Rather, where "a court concludes that the arbitrator did not stay within the bounds of his authority, this principle of deference inevitably gives way ... to the greater principle that an award not drawing its essence from the agreement is not entitled to judicial enforcement." *Centralab v. Local No. 816, Int'l Union of Elec. Workers,* 827 F.2d 1210, 1217 (8th Cir.1987). Such an award must be vacated because "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960); *see also Franklin Elec. Co. v. International Union, UAW,* 886 F.2d 188, 190–91 (8th Cir.1989). While the issue of whether the arbitrator exceeded his authority is reviewable, we must broadly construe the collective bargaining agreement and resolve all doubts in favor of the arbitrator's authority. *Lackawanna Leather Co. v. United Food & Commercial Workers Int'l Union,* 706 F.2d 228, 230–31 (8th Cir.1983) (en banc); *see also Pack Concrete v. Cunningham,* 866 F.2d 283, 285 (9th Cir.1989) (holding that "an arbitrator's interpretation of the scope of the issue submitted to him is entitled to the same deference accorded his interpretation of the collective bargaining agreement").

■ The district court thoroughly discussed this issue and then concluded that the arbitrator was not authorized to decide whether sympathy strikes were permitted by the collective bargaining agreement. This led the court to characterize the arbitrator's decision as "arbitration by ambush." It pointed out that it would have been irrational for Morrell to consent to arbitrate the meaning of the no-strike clause after obtaining a jury verdict in its favor on this issue; the court found this contention particularly incredible in light of the fact that neither party had submitted evidence to the arbitrator on the issue. The court also noted that the arbitrator's

own characterization of the issue did not suggest that the issue of the legality of the strikes was submitted for arbitration. After reviewing the record, the arbitration clause, and the issue submitted for arbitration, we are similarly persuaded that the arbitrator failed to stay "within the areas marked out for his consideration." *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 598, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).

After the jury verdict on the liability issue, the parties held a preliminary arbitration hearing. There was evidence that the parties indicated at that time that they did not want the arbitrator to address the issue of the legality of sympathy strikes. Each party insisted that it would prevail in arbitration of the recall issue regardless of the outcome of the appeal of the liability verdict, the appeal currently before us. The parties discussed providing the arbitrator with their briefing of the sympathy strike issue; the evidence suggests, however, that the parties intended such information to be used only as background material for the recall issue. Indeed, when the parties stated the issues in their opening briefs for the arbitrator, neither party referred to the issue of the legality of the strikes. As a result, the arbitrator framed the issue before him in the terms agreed upon by the parties: "Do the seniority and discrimination provisions of the parties' collective bargaining agreement apply to the recall of those employees who were on a sympathy strike from May 1 to November 4, 1987?"

This characterization of the issue contains no suggestion that the issue previously decided by the jury, the meaning of the no-strike clause, was submitted for arbitration. Moreover, neither party offered any evidence on the issue, although both parties had presented extensive evidence on bargaining history and relevant conduct to aid the jury in interpreting the no-strike clause. As the district court noted, this lack of evidence suggests that the parties believed that the issue would not be arbitrated.[13]

13. This case is distinguishable from *Lackawan-* *na Leather,* 706 F.2d 228, where this court held

The Unions emphasize that Morrell relied upon a breach of contract defense in arbitrating the recall issue and point out that Morrell sought to frame the issue in the following terms: "Given a strike in violation of the agreement," was the company required to reinstate the strikers? We are not persuaded that this means that Morrell intended to arbitrate the meaning of the no-strike clause. Rather, it indicates that Morrell assumed that the strike was in breach of their agreement and thus provided a defense to the grievances. That assumption was supported by the jury verdict in the company's favor.

■ The Unions argue that the district court erred in holding that Morrell's consent was required in order for the arbitrator to reach the issue of the legality of the strikes. They urge that since Morrell, in the collective bargaining agreement, agreed to submit "any dispute which may arise between the Company and the Union" to "final and binding arbitration," the arbitrator was authorized to resolve the issue of the legality of the strikes. The Unions seem to contend that the broad arbitration clause, which Morrell conceded made the legality of the strikes arbitrable, somehow prohibited Morrell from limiting the issues which the arbitrator may decide.

We reject the argument that the scope of the arbitrator's authority is limited only by the arbitration clause. It is fundamental that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration. *Gateway Coal Co. v. UMW*, 414 U.S. at 374, 94 S.Ct. at 635. The arbitration provision "constitutes merely a promise to arbitrate." *Piggly Wiggly Operators' Whse.*, 611 F.2d at 583. "Before arbitration can actually proceed, it is necessary for the parties to supplement the agreement to arbitrate by defining the issue to be submitted to the arbitrator and by explicitly giving him authority to act."

*Id.* "[O]nce the parties have gone beyond their promise to arbitrate and have actually submitted an issue to an arbiter, we must look *both to their contract and to the submission of the issue to the arbitrator* to determine his authority." *Id.* at 584 (emphasis added). "[T]he initial contract to arbitrate may be modified by the submission agreement or grievance." *Id.* There are many instances where courts have recognized that the scope of the arbitrator's authority depends, in part, upon how the parties have framed the issue to be arbitrated. *See, e.g., Synergy Gas Co. v. Sasso*, 853 F.2d 59, 63–64 (2d Cir.1988), *cert. denied*, 488 U.S. 994, 109 S.Ct. 559, 102 L.Ed.2d 585 (1988); *Sunshine Mining Co. v. United Steelworkers*, 823 F.2d 1289, 1294 (9th Cir.1987); *International Chemical Workers Union, Local No. 566 v. Mobay Chemical Corp.*, 755 F.2d 1107, 1110 (4th Cir.1985); *Courier–Citizen Co. v. Boston Electrotypers Union No. 11*, 702 F.2d 273, 281 (1st Cir.1983); *Wren v. Sletten Constr. Co.*, 654 F.2d 529, 533 (9th Cir. 1981); *see also* R. Gorman, *Basic Text on Labor Law: Unionization and Collective Bargaining* 588 (1976). We believe that this case also illustrates such an instance.

We also note that "the agreement to arbitrate particular issues need not be express. It may be implied or established by the conduct of the parties." *Mobay*, 755 F.2d at 1110. The conduct of Morrell, described previously, which indicated that it did not intend to arbitrate the issue of the legality of the strikes, provides further support for our decision. In sum, we are satisfied that the arbitrator was not "even arguably ... acting within the scope of his authority," *Misco*, 484 U.S. at 38, 108 S.Ct. at 371, in interpreting the no-strike clause, and therefore, the district court did not err in vacating the award.

**B.**

Alternatively, the district court held that the arbitration award must be vacated be-

that the arbitrator had not exceeded the scope of his authority in deciding an issue on which the parties had not presented evidence. *Id.* at 231–32. The fact that the parties had not offered evidence on the issue has more significance in this case than in *Lackawanna.* Here,

the prior jury determination of the issue provides stronger support for the contention that the parties did not intend to arbitrate the issue and therefore saw no need to submit evidence on it.

cause, under the doctrine of res judicata,[14] the arbitrator was bound by the jury's finding that the collective bargaining agreement prohibited sympathy strikes. We recognize, as did the district court, that we need not reach this issue unless we assume that it was properly before the arbitrator, a proposition which we have just rejected. We believe, however, that this alternative basis provides strong support for the district court's ruling and that it is appropriate that we consider it. The Unions challenge this reasoning by arguing that: (1) arbitrators are generally not bound by res judicata principles; and (2) even if res judicata principles were applicable, the requirements for the doctrine are not met here because the arbitration award was issued before the district court entered a final judgment in the case.[15] We reject these arguments and affirm the district court's vacation of the arbitration award on this ground also.

■■■■■ Assuming that the requirements of the test for issue preclusion are satisfied,[16] we believe that the arbitrator was barred from reconsidering the issue decided in the prior judicial proceeding. There is scant authority determining the effect of a prior judicial decision on an arbitration proceeding because the issue arises only in rare situations; several courts, however, have held that issue and claim preclusion may bar arbitrators. *See, e.g., Miller Brewing Co. v. Fort Worth Distrib. Co.,* 781 F.2d 494, 501 (5th Cir.

1986); *Telephone Workers Union of New Jersey, Local 827 v. New Jersey Bell Tel. Co.,* 584 F.2d 31, 33–34 (3d Cir.1978); *Burmah Oil Tankers v. Trisun Tankers,* 687 F.Supp. 897, 899 (S.D.N.Y.1988); *Hudson–Berlind Corp. v. Local 807, Affiliated with the Int'l Bhd. of Teamsters,* 597 F.Supp. 1282, 1285–86 (E.D.N.Y.1984). Cases which have refused to apply issue preclusion to arbitrators have done so because the requirements for issue preclusion were not met. *See, e.g., W.R. Grace & Co. v. Local Union No. 759, Int'l Union of the United Rubber Workers,* 461 U.S. 757, 765, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983) (refusing to apply res judicata where arbitrator's earlier award had exceeded his authority); *McGraw Edison, Wagner Div. v. Local 1104, Int'l Union of Elec. Workers,* 767 F.2d 485, 489 (8th Cir.1985) (holding that an arbitrator was not bound by an earlier award involving a different contract and different union).

■■■■ We recognize that the arbitrator had the authority to determine in the first instance whether to give the prior judicial determination preclusive effect. *Trailways Lines,* 807 F.2d at 1425. We must review the arbitrator's determination of the issue with deference, but we may vacate the award if his decision on the preclusion issue reflects his "own brand of industrial justice." *Misco,* 484 U.S. at 36, 108 S.Ct. at 371. In *Trailways,* for example, we held that an arbitrator was bound by a prior award involving "the same company, the

---

**14.** Technically, the court's decision was based upon the doctrine of collateral estoppel, also referred to as issue preclusion. The Supreme Court has explained that:

> Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Under the doctrine of collateral estoppel, ... the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.

*Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979).

**15.** The Unions also argue that Morrell waived its res judicata defense by failing to assert it

during arbitration. We are satisfied that Morrell sufficiently preserved this defense, particularly in light of the evidence indicating that the parties did not intend or expect the arbitrator to reconsider the meaning of the no-strike clause.

**16.** Issue preclusion bars relitigation of an issue if the same issue was involved in both actions; the issue was actually litigated in the first action after a full and fair opportunity for litigation; the issue was actually decided in the first action on the merits; the disposition was sufficiently final; and resolution of the issue was necessary in the first action. *See* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4416, at 137–38 (1981); *see also Parklane Hosiery,* 439 U.S. at 326 n. 5, 99 S.Ct. at 649 n. 5. It is only the finality requirement which is challenged in this appeal.

same union, essentially the same issue, and interpretation of the same contract." 807 F.2d at 1425. *Trailways* involved the res judicata effect of a prior arbitration award upon a later arbitration. The situation before us presents a stronger case because we are examining the preclusive effect of a judicial proceeding in the same dispute. We cannot ignore the strong factual identity between the issue resolved by the jury and the issue addressed by the arbitrator. The liability trial and the arbitration proceeding both arose out of the same factual circumstances and involved the same parties and contract. If this entire series of disputes were addressed in one tribunal, there can be no doubt that the jury verdict would preclude further consideration of the legality of the sympathy strikes. For the arbitrator to reject·the jury verdict was to disregard the law, *see Stroh Container Co. v. Delphi Indus.*, 783 F.2d 743, 750 (8th Cir.), *cert. denied*, 476 U.S. 1141, 106 S.Ct. 2249, 90 L.Ed.2d 695 (1986), and to substitute "his own brand of industrial justice," *Enterprise Wheel & Car Corp.*, 363 U.S. at 597, 80 S.Ct. at 1361, for the deliberations and verdict of the jury. Furthermore, the reasons given by the arbitrator for disregarding the verdict do not withstand scrutiny. He stated, in the arbitration award, that he was not bound by the jury verdict because he did not have the benefit of a trial transcript, the jury instructions, or the evidence justifying submitting the issue to the jury. Neither the lack of a trial record, nor his role as an arbitrator, authorized him to sit as an appellate court and consider anew the rulings of the district court and the verdict of the jury. Accordingly, we are unpersuaded by

the Unions' arguments that the arbitrator was not bound by principles of res judicata.

 Furthermore, we reject the Unions' argument that the verdict cannot have preclusive effect because the jury's liability verdict was not immediately appealable since the damages phase of the trial had not concluded. *See* 28 U.S.C. § 1291 (1988). While this circuit has not squarely confronted this issue,[17] we believe that finality for purpose of appeal under section 1291 is not necessarily the finality that is required for issue preclusion purposes.

 The availability of judicial review is merely one factor to consider in determining whether issue preclusion applies. *See* Restatement (Second) of Judgments § 13 comment g (1982). As Judge Friendly has explained, " '[f]inality' in the context [of issue preclusion] may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir.1961), *cert. denied*, 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962). "[W]e see no reason why in an appropriate case a ruling that is final on the issue of liability should not preclude the party against whom the decision ran from presenting further evidence on the issue there finally determined." *Zdanok v. Glidden Co., Durkee Famous Foods Div.*, 327 F.2d 944, 955 (2d Cir.) (Friendly, J.), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). Other courts have also followed Judge Friendly's reasoning. In *Miller Brewing Co. v. Jos. Schlitz Co.*, 605 F.2d 990 (7th Cir.1979), *cert. denied*, 444 U.S.

**17.** The Unions urge that this court resolved this issue in *United States v. Arkansas*, 791 F.2d 1573 (8th Cir.1986), by stating that "[t]he doctrine of *res judicata* therefore is simply inapplicable, for there has been no earlier final judgment from which the State could appeal." *Id.* at 1576. The court there was addressing the narrow issue of whether a dismissal under Rule 54(b) of the Federal Rules of Civil Procedure should be given preclusive effect. The rule expressly provides that such dismissals are "subject to revision at any time before the entry of judgment" and therefore are inherently tentative. Thus, the court was not faced with the issue here:

whether a jury verdict after a full trial on the merits precluded reconsideration of the issue. We are satisfied that the language which the Unions rely upon in *United States v. Arkansas* should not be read out of the context of the special factual circumstances of that case.

Furthermore, we are unpersuaded by the Unions' argument that *McGraw Edison*, 767 F.2d 485, stands for the broad proposition that arbitrators are not bound by res judicata principles. The court found the doctrine inapplicable there because the earlier award involved a different contract and different union. *Id.* at 489.

1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980), the Seventh Circuit held that an interlocutory appeal from a preliminary injunction "will be given preclusive effect if it is necessarily based upon a determination that constitutes an insuperable obstacle to the plaintiff's success on the merits." *Id.* at 995; *see also O'Reilly v. Malon,* 747 F.2d 820, 823 (1st Cir.1984) (per curiam); *Aiello v. City of Wilmington,* 470 F.Supp. 414, 418–19 (D.Del.1979), *aff'd,* 623 F.2d 845 (3d Cir.1980); *Aetna Cas. & Surety Co. v. Jeppesen & Co.,* 440 F.Supp. 394, 399–403 (D.Nev.1977). Authoritative commentaries also provide support for our conclusion. *See* Restatement (Second) of Judgments § 13 comment g & illustration 3 (providing an illustration where a liability finding in a bifurcated trial would have a preclusive effect before the damages phase of the trial was completed); 18 C. Wright, A. Miller & E. Cooper, *supra* § 4434, at 321 (stating that "[r]ecent decisions have relaxed traditional views of the finality requirement by applying issue preclusion to matters resolved by preliminary rulings or to determinations of liability that have not yet been completed by an award of damages or other relief").

In sum, we are satisfied that the jury's verdict that the no-strike clause prohibited sympathy strikes was sufficiently final to bind the arbitrator here. Both parties presented abundant evidence on the issue at trial, and both had strong incentives to litigate the issue fully. Furthermore, the jury's verdict addressed the exact issue which the arbitrator chose to reconsider. Accordingly, we see "no really good reason for permitting it to be litigated again." *Lummus,* 297 F.2d at 89. Thus, the arbitrator's decision to ignore this precedent fails to draw its essence from the contract and was properly vacated.

## IV.

In conclusion, we have carefully considered all of the Unions' arguments, and we are convinced that they lack merit. Accordingly, we affirm the district court's judgment in favor of Morrell and its order vacating the arbitration award.

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent. In my view, the district court erred as a matter of law in finding that the no-strike clause set forth in Article II, Clause 5 of the Collective Bargaining Agreement was ambiguous.

Ordinarily, construction of contractual agreements constitutes a question of law. *UFCW Local 150 v. Dubuque Packing Co.,* 756 F.2d 66, 69 (8th Cir.1985) (*UFCW Local 150*). The general rule is that interpretation of a contract is for the court and that the contract meaning is to be garnered from the four corners of the document. *Atkins v. Hartford Casualty Insurance Co.,* 801 F.2d 346, 348 (8th Cir.1986) (citing *Press Machinery Corp. v. Smith RPM Corp.,* 727 F.2d 781, 784 (8th Cir.1984)). This rule reflects the sound policy judgment that assigning questions of contract interpretation to the court contributes to the stability and predictability of contractual relations by limiting the power of the trier of fact. *See Restatement (Second) of Contracts* § 212 comment b (1981).

To further this policy, questions of contract interpretation are also treated as questions of law for purposes of appellate review. *Restatement (Second) of Contracts* § 212 comment b. As this court has stated, appellate courts "are not required to defer to the interpretation given [to the parties' collective bargaining agreements] by the district court." *Mackey v. National Football League,* 543 F.2d 606, 612 (8th Cir.1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); *see Arkansas Rice Growers v. Alchemy Industries, Inc.,* 797 F.2d 565, 567 (8th Cir.1986) (it is well settled that the construction and legal effect of a contract are questions of law subject to de novo review); *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509, 519 (8th Cir.) (the interpretation and construction of written contracts are matters of law within the competence of courts of appeals to review), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *United Auto Workers v. General Electric Co.,* 714 F.2d 830, 832 (8th Cir.1983) (interpretation of a contract is a matter of law

and is not therefore subject to the clearly erroneous standard of review by this court); *Swanson v. Baker Industries, Inc.*, 615 F.2d 479, 483 (8th Cir.1980) (the proper construction of a written contract is a question of law to be determined by the court).

The general rules just noted are subject to the one limitation that has been pressed in the present case, i.e., where a contract is deemed ambiguous, the court may weigh extrinsic evidence to aide in its construction. *UFCW Local 150*, 756 F.2d at 69. The ambiguity exception, however, is tightly bound. Extrinsic evidence is *not* admissible for the purpose of showing that the parties intended to make an agreement which is inconsistent with the unambiguous words of their written contract. *St. Louis Union Trust Co. v. United States*, 617 F.2d 1293, 1300 (8th Cir.1980). And a mere difference of opinion as to the proper interpretation does not render the contract ambiguous as a matter of law. *Press Machinery Corp.*, 727 F.2d at 784. Rather, a contract is ambiguous only if the court determines that its words are reasonably susceptible to more than one construction by a person acquainted with all operative usages and knowing all of the circumstances prior to and contemporaneous with the making of the contract. Finally, whether a contract is ambiguous is a question of law to be resolved by the trial court in the first instance and which is subject to review by the appellate court. *Motor Carriers Council, Inc. v. Local 600*, 486 F.2d 650, 653 (8th Cir.1973). The trial court's finding of ambiguity is not subject to the clearly erroneous standard of review, but rather is reviewed de novo by the appellate court. *Western Contracting Corp. v. Dow Chemical Co.*, 664 F.2d 1097, 1100 (8th Cir.1981). Stated in pure contract law terms, then, the threshold question in the present case is whether the district court correctly concluded that the no-strike clause in the parties' collective bargaining agreement is ambiguous and therefore subject to jury interpretation on the basis of extrinsic evidence.

However, to frame the issue solely in these terms ignores the labor law context in which this case arises and the substantive labor law principles that are therefore implicated. Morrell brought this suit under § 301 of the Labor–Management Relations Act of 1947 (LMRA), 29 U.S.C. § 185 (1988). The Supreme Court's decision in *Textile Workers Union of America v. Lincoln Mills of Alabama*, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957) (*Lincoln Mills*), teaches us that in cases such as this the substantive law to apply is federal law, which the courts must fashion from the policy of our national labor laws. *Lincoln Mills*, moreover, provides concrete guidance as to how such law is to be fashioned:

> The Labor–Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanctions but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy.

353 U.S. at 457, 77 S.Ct. at 918.

The LMRA expressly furnishes some substantive law that is directly relevant to the issues presented in this case. Specifically, § 7 of that Act, 29 U.S.C. § 157 (1988), generally protects employees who engage in sympathy strikes in support of a lawful, primary strike by another union. *See AMCAR Division, ACF Industries, Inc. v. NLRB*, 641 F.2d 561, 566 (8th Cir. 1981) (*AMCAR Division*). That protection, to be sure, is not absolute; under § 9 of the LMRA, 29 U.S.C. § 159 (1988), an exclusive bargaining representative can, through collective bargaining, waive such a right on behalf of the employees represented by the union. *See id.* Nevertheless, the protection of the right to strike has real substance; the Supreme Court has made it clear that it is not proper to

> infer from a general contractual provision that the parties intended to waive a [LMRA] statutorily protected right unless the undertaking is 'explicitly stated.' More succinctly, the waiver must be clear and unmistakable.

**566**

*Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983). And, as this court once stated in a decision which correctly anticipated the holding in *Metropolitan Edison*,

> in the collective bargaining agreement, employees may waive their right to engage in sympathy strikes. Where there is not an express waiver of this right, the evidence of waiver must be clear and unmistakable.

*AMCAR Division*, 641 F.2d at 566 (citations omitted). Thus, general rules governing contract interpretation and specific statutory rules in the LMRA governing the right to strike tend to intersect.

In a commercial contract case, a showing by the plaintiff that a certain contractual provision may reasonably be read as prohibiting the defendant from acting as he did would be sufficient to establish that the contract is ambiguous. Under *Metropolitan Edison*, however, that there exists two plausible interpretations of a no-strike clause in a collective bargaining agreement, one permitting sympathy strikes and one prohibiting such strikes, does not establish a legally relevant ambiguity. As a matter of substantive labor law, a collective bargaining agreement which can be plausibly read to prohibit sympathy strikes and also plausibly read to permit such strikes does not constitute a waiver of the statutory right to engage in sympathy strikes. Only an agreement which clearly and unmistakably waives that statutory right constitutes a legally operative waiver and only such an agreement can give rise to a breach of contract claim based on a sympathy strike. Thus, in our case, the threshold question for our review is whether the no-strike clause can reasonably be read to waive in clear and unmistakable terms the right to engage in sympathy strikes. And that question, like any threshold question of contract interpretation, is a determination for this court to make de novo.

In determining whether a contract is ambiguous, and, hence, whether the contract meaning is to be determined by the factfinder on the basis of extrinsic evidence, the starting point is the language of the contract. The words chosen by the parties are to be given their plain and ordinary meaning as understood by reasonable persons experienced in negotiating the kind of contract in question. *Leman Bros. Kuhn Loeb Inc. v. Clark Oil & Refining Corp.*, 739 F.2d 1313, 1317 (8th Cir.1984) (citing *Universal Towing Co. v. United Barge Co.*, 579 F.2d 1098, 1101 (8th Cir.1978)), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985)).

First we note that express no-strike pledges fall into two general categories: (1) unconditional bans on any interference with production during the life of the contract; and (2) conditional bans which permit strikes under certain circumstances. *Basic Patterns: Strikes and Lockouts*, 2 Collective Bargaining Negotiations and Contracts (BNA) No. 1142, at 77:1 (1987). Over 60% of all no-strike clauses are of the unconditional type and ban any, all or every strike during the life of the contract without qualification and without reference to the arbitration provision of the contract. *Id.* The clause being considered in this case is not of that type, however. Because the language is so critical to our analysis, it is worth repeating here. Article II, Clause 5 provides:

> Provisions having been made by this agreement and local agreements for the peaceful and orderly settlement of any disputes which may arise between company and the union or local union or any employee or employees, it is agreed that during the terms of this agreement there shall be no strike, stoppage, slowdown, or suspension of work on the part of the union or any local union or any union member or lockout on the part of the company on *account of such disputes until after the earnest efforts shall be made to settle all such matters in the manner provided in the respective amendments.*

By its own terms, this no-strike provision does not obligate workers to refrain from *all* work stoppages during the life of the contract; rather, it contains a promise not to strike on account of a specified class of disputes, disputes for which provisions

have been made in the collective bargaining agreement "for ... peaceful and orderly settlement." And even as to those particular kinds of disputes, the workers are free to strike after an earnest effort has been made to settle in the manner provided in the agreement. Thus, the no-strike provision is expressly linked to and limited by the obligation to settle disputes according to the grievance arbitration clause in the collective bargaining agreement. These words, if defined according to their plain and ordinary meaning as that meaning is understood by experienced, reasonable, labor bargaining-agreement negotiators, simply cannot be read to outlaw sympathy strikes because a sympathy strike, by definition, is not a strike over a dispute that is subject to peaceful and orderly settlement under the provisions of the bargaining agreement between the sympathy strikers and their employer. Rather, the dispute underlying the sympathy strike is always between the employer and a different group of workers and ordinarily arises out of those workers' efforts to secure a new collective bargaining agreement.

Indeed, it is precisely because a sympathy strike is undertaken in support of a sister union's effort to negotiate with its employer and because neither the causes nor the issues underlying a sympathy strike are subject to the settlement procedures provided by the contract between the employer and the union conducting the sympathy strike that the Supreme Court has held that sympathy strikes, unlike strikes over arbitrable disputes, are not subject to federal court injunctions. *Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 407-08, 96 S.Ct. 3141, 3147-48, 49 L.Ed.2d 1022 (1976); *see Purex Corp. v. Automotive Employees Union, Local 618*, 705 F.2d 274, 276-77 (8th Cir.1983). For precisely the same reason, the words of this limited no-strike clause expressly linked to the grievance arbitration procedure cannot be read to even plausibly, let alone clearly and unmistakably, proscribe sympathy strikes. A recent decision of the NLRB lends further support. In *Bristol Convalescent Home, Inc.*, the NLRB held that a no-strike clause

which makes specific reference to arbitrability

[i]ndicates that the no-strike provision is functionally related to arbitration and intended to be in effect only when disputes could be resolved by the arbitration process.... This apparent relationship between the express no-strike provision and arbitration warrants the inference that the parties intended a narrower limitation on strikes than in cases involving the express no-strike provision that is functionally independent from the arbitration process.

*Bristol Convalescent Home, Inc.*, 293 NLRB No. 73, slip op. at 3 (April 11, 1989).

Here, the no-strike clause does not contain a promise that there shall be no strike whatsoever; rather the clause states only that there shall be no strike on account of a dispute arising between the company and the union until after an earnest effort has been made to settle the disputes in the manner provided in the agreement. Clearly this promise applies only to strikes over arbitrable disputes between the company and the union. This clause cannot be fairly read to apply to situations in which there is no underlying dispute between the company and the union that is subject to being settled in the manner provided in the collective bargaining agreement. Only by distortion of the words in the contract is Morrell able to even argue, let alone persuade a court, that the clause can plausibly be read to constitute a clear and unmistakable waiver of the right to engage in a sympathy strike.

*Iowa Beef*, relied upon by the majority, is distinct from the case at hand because it involved a general, unconditional no-strike clause, rather than a limited no-strike clause of the type contained in the instant contract. 597 F.2d at 1143-44. In *Iowa Beef*, the union argued that because of the clear and unmistakable waiver rule and because the union's promise not to strike was given in return for the employer's promise to arbitrate contractual disputes arising under the agreement, even the unconditional no-strike clause must be read to be confined *sub silentio* to arbitrable dis-

putes. *Id.* at 1145. Although this theory has been rejected by some courts, including the *Iowa Beef* court, those courts have uniformly made it clear that where a no-strike clause is, in express terms, limited by the arbitration clause, it is presumed "that the employees' waiver [of the right to strike] is no greater than the employer's obligation under the arbitration clause." *Pacemaker Yacht Co. v. NLRB*, 663 F.2d 455, 458 (3d Cir.1981) (*Pacemaker*); *see United States Steel Corp. v. NLRB*, 711 F.2d 772, 777 (7th Cir.1983) (*United States Steel*). In *Pacemaker*, the express no-strike clause was in no way limited by its terms to arbitrate disputes. To the contrary, the agreement included one no-strike provision which was clearly intended to bar strikes over arbitrable disputes *and* another which covered strikes over all other disputes. *Pacemaker*, 663 F.2d at 456–59. Likewise, in *United States Steel*, the agreement contained a general, unconditional no-strike clause. 711 F.2d at 778. Rejecting an argument that the general no-strike clause should be limited to strikes over arbitrable disputes, the court nevertheless recognized, "[o]f course in cases where an arbitration clause and an express no-strike clause are closely interwoven, it may be reasonable to infer that the parties intended the two provisions to have the same scope." *Id.* at 777. This is such a case. Not only is the no-strike clause in this case "closely interwoven" with the arbitration clause, it also expressly refers only to strikes over arbitrable disputes between the company and the union. As such it cannot reasonably be read as waiving in clear and unmistakable terms the right to engage in sympathy strikes, which are by definition, nonarbitrable disputes.

Finally, the court's reliance upon the "struck work" clause in the Sioux Falls collective bargaining agreement to negate the plain meaning of the no-strike clause at issue is misplaced. These two clauses deal with qualitatively different labor relation issues and do so in a way which create no conflict whatsoever. Under the LMRA, workers who elect to honor a lawful picket line and do not report to work and do not draw pay are exercising a statutorily pro-tected right. *See* 29 U.S.C. § 157. Conversely, employees who elect to report to work and to draw their pay do not have any statutory right to refuse to perform struck work, namely, work undertaken for another employer whose workers are on strike. Thus, employers have the right to require their employees to perform such work. *See, NLRB v. Electrical Workers*, 346 U.S. 464, 476 n. 12, 74 S.Ct. 172, 178 n. 12, 98 L.Ed. 195 (1953); *NLRB v. Montgomery Ward & Co., Inc.*, 157 F.2d 486, 496–97 (8th Cir.1946); *Vic Koenig Chevrolet*, 263 NLRB 646, 649–50 (1982).

For the reasons given herein, I would reverse the decision entered below and direct that judgment be entered for the unions on Morrell's claim for damages under the no-strike provision of the collective bargaining agreement. Because that provision does not, as a matter of law, bar sympathy strikes, I would also reverse the district court's decision vacating the arbitration award.